# Exhibit B

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK: COMMERCIAL DIVISION**

**NEUROMIND AI CORP. f/k/a GENESIS GROWTH TECH ACQUISITION CORPORATION and GENESIS GROWTH TECH, LLC,**

Plaintiff,

-against-

**CITRIN COOPERMAN & COMPANY, LLP,**

Defendant.

Index No.: ________________________
Date Purchased: ___________________

**SUMMONS WITH NOTICE**

Plaintiffs designate New York County, Commercial Division, as the place of trial.

The basis of venue is that Defendant conducts business in New York and maintains an office at 50 Rockefeller Plaza, New York, New York 10020.

**TO THE ABOVE-NAMED DEFENDANT:**

**YOU ARE HEREBY SUMMONED** to appear in this action by serving a notice of appearance on the Plaintiff's Attorney within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to appear, judgment will be taken against you by default for the relief demanded in the notice set forth below.

**NOTICE**

**Nature of Action**

This action arises from the professional malpractice, gross negligence, breach of contract, and negligent misrepresentation of Defendant Citrin Cooperman & Company, LLP ("Citrin" or "Defendant"), a public accounting firm doing business at 50 Rockefeller Plaza, New York, New York 10020, while serving as the independent registered public accounting firm for Genesis Growth Tech Acquisition Corp. (the "Company"), a Cayman Island blank-check special purpose acquisition company ("SPAC"). Plaintiff Genesis Growth Tech, LLC (the

"Sponsor" or "Plaintiff") is the Sponsor of the Company and a non-signatory to Citrin's engagement agreement, which brings this action directly in court.

**The Parties and the Engagement**

On or about May 18, 2021, Citrin entered into an engagement letter with the Company pursuant to which Citrin agreed to audit the Company's financial statements and to provide SEC-required audit and review services in connection with the Company's Form S-1 registration statement and subsequent periodic filings. Citrin purportedly assembled a dedicated SPAC-focused engagement team.

Citrin expressly committed in its engagement letter that its audit procedures would include "direct confirmation of certain assets and liabilities by correspondence with selected creditors and financial institutions" and that it would "communicate in writing to the audit committee and management all material weaknesses and significant deficiencies" identified during the audit. These commitments were reiterated in Citrin's March 10, 2023 engagement letter addressed to the Company's Audit Committee Chair and Chief Executive Officer. Citrin further committed to evaluate and address all related-party identification, accounting, and disclosure, and to communicate to the audit committee all matters requiring material modifications identified during interim reviews. The governing law of the engagement is the law of the State of New York.

Citrin's standards of care were clear. As an SEC-registrant auditor registered with the Public Company Accounting Oversight Board ("PCAOB"), Citrin was required to conduct its audits and interim reviews in compliance with PCAOB auditing standards, applicable SEC rules and regulations, and the rules of the PCAOB. Those standards require, among other things, that Citrin obtain sufficient appropriate audit evidence over all material financial statement line items, including cash, and properly evaluate and disclose all related-party transactions and arrangements.

**Citrin's Governance-Facing Representations**

On or about July 21, 2021, Citrin delivered formal "Required Communications" to the Board of Directors of the Company covering the audit of the Company's financial statements for the period from March 17, 2021 through May 26, 2021. These board-level communications were not casual remarks; they were formal PCAOB-mandated representations to those charged with governance, addressing precisely the categories of risk that later exploded into the non-reliance, restatement, and listing impairment at the core of this action.

Among other representations, Citrin specifically reported to the Board:

(i) Summary of Unrecorded Adjustments: "CURRENT PERIOD: None noted."

(ii) Disagreements with Management: "We are pleased to report that no disagreements with management arose during the course of our audit."

(iii) Significant Issues Discussed with Management: "None."

(iv) Management's Consultations with Other Accountants: "None."

(v) Difficulties Encountered During the Audit: "No significant difficulties noted."

(vi) Internal Control Matters: "No deficiencies or material weaknesses were identified as a result of our audit procedures."

(vii) Related Party Relationships and Transactions: Citrin represented that as part of its audit, it evaluated the Company's identification of, accounting for, and disclosure of the Company's transactions with related parties, and reported "no related parties or related party relationships or transactions that were previously undisclosed" and no "significant related-party transactions that appeared to lack a business purpose."

Citrin specifically identified "Related party disclosures," "Sponsor seed equity," and "Related Party Transactions" as key audit areas of focus, representing that it obtained all relevant agreements to support its evaluation of the Company's related-party transactions and reviewed the Form S-1 to evaluate disclosure adequacy. Citrin also acknowledged that its audit scope specifically covered the Sponsor's purchase of 7,187,500 Class B common stock shares, Private Placement Warrants, Sponsor loans of up to $500,000, and entity-affiliated support services of approximately $10,000 per month following the IPO.

The Sponsor, as the entity charged with funding the Company's operations, directly and foreseeably relied on Citrin's clean governance-facing representations and audit opinion in continuing to advance funds, execute extension loans, fund private placement warrants, and pursue business combination opportunities on behalf of the Company.

**Citrin's Core Professional Failures**

Notwithstanding its explicit commitments and clean governance-facing representations, Citrin committed a series of severe professional failures that fell far below the applicable standard of care:

**1. Failure to Obtain Bank Confirmations Over Operating Cash.**

Cash is among the highest-risk and most readily confirmable balance sheet items in any audit. PCAOB auditing standards require an auditor to obtain direct, third-party confirmation of cash balances with financial institutions. Citrin's own engagement letter expressly committed to "direct confirmation of certain assets and liabilities by correspondence with … financial institutions." Yet Citrin failed to send any bank confirmations regarding the Company's operating account. Had Citrin performed this single, mandatory, PCAOB-required procedure the account title discrepancy would have been discovered immediately, years before the resulting non-reliance and restatement.

**2. Failure to Identify and Address Affiliate-Titled Operating Cash Account.**

During the Company's IPO on December 9, 2021, and through approximately April 2023, operating funds intended for the Company were maintained in a bank account titled to and owned by an affiliate of the Sponsor (the "Affiliate Account"), rather than in any bank account directly belonging to the Company. The Affiliate Account was an operating bank account located in Geneva, Switzerland. The Company paid for all operating expenses from the IPO through April 2023 exclusively through this Affiliate Account. Management's subsequent SAB 99/108 analysis, reviewed and validated by the Company's successor accountants, confirmed that the Company's previously issued financial statements were misstated by presenting Affiliate Account cash as Company cash, specifically, the 10-K for the year ended December 31, 2021, and the 10-Q reports for the quarterly periods ended March 31, 2022, June 30, 2022, and September 30, 2022. The new accountants concluded that the misstatement

would have a material effect on the readers of the Company's financial statements and resulted in a material weakness, which required restatement of the periods described above.

**3. Failure to Identify, Escalate, and Communicate a Material Weakness.**

A competent SEC-registrant audit must not only identify related-party cash arrangements but must evaluate their classification, disclosure consequences, and internal control implications, and must escalate any material weakness to the Audit Committee in writing. Citrin identified none of this. To the contrary, Citrin represented to the Board that there were no unrecorded adjustments, no significant difficulties, no significant issues, and no undisclosed related-party transactions. Citrin made these representations while the risk categories that Citrin represented it had evaluated contained a material misstatement requiring restatement and a material weakness in internal controls over financial reporting.

**4. Inconsistent Governance Communications.**

Citrin's representations to the Board were directly contradicted by the subsequent facts: the Company's financial statements were misstated across multiple periods; the Affiliate Account structure constituted both a related-party disclosure failure and an internal control deficiency; and Citrin withdrew from association with those financial statements under Item 4.02 of Form 8-K. Citrin cannot simultaneously represent "no significant difficulties" and "no undisclosed related parties" to the Board while those very deficiencies are latent in the financial statements Citrin was certifying.

**<u>Citrin's Resignation, Non-Reliance Disclosure, and Catastrophic Timing</u>**

On April 12, 2023, Citrin resigned as the Company's auditors effectively immediately. By letter dated May 15, 2023, Citrin advised the Company's Audit Committee Chair and Chief Executive Officer that Citrin could not continue to be associated with the following financial statements (the "<u>Impacted Financial Statements</u>"): (i) the audited financial statements of the Company as of December 31, 2021 and for the period from March 17, 2021 (inception) through December 31, 2021, on which Citrin had issued an audit report dated April 15, 2022; and (ii) the unaudited condensed financial statements contained in the Company's Quarterly Reports on Form 10-Q for the periods ended March 31, 2022, June 30, 2022, and September 30, 2022. Citrin stated that the Impacted Financial Statements may be incorrect and that the impact of the error may be material.

On information and belief, Citrin's May 15, 2023 letter asserted that the audit evidence obtained from the Company to perform the audit and interim review procedures over the Company's cash account was not reliable and that Citrin had concerns about the integrity of management, including their previously provided management representations. Citrin directed the Company to take appropriate action to prevent further reliance on the Impacted Financial Statements, including the filing of a Current Report on Form 8-K pursuant to Item 4.02(b) of that form.

The timing of Citrin's non-reliance conduct was catastrophically destructive. On May 23, 2023, the same day the Company publicly announced its proposed business combination with NextTrip, Inc., a travel technology company, Citrin sent its Exhibit 16.1 letter to the SEC's Office of the Chief Accountant, triggering the filing of a Non-Reliance 8-K. This concurrent

filing killed the NextTrip transaction. The announcement that the Company's prior financial statements could not be relied upon, published simultaneously with the merger announcement, rendered the Company unable to maintain the reporting currency and listing posture necessary to consummate the combination. The non-reliance, restatement, and associated reporting disruptions further generated Nasdaq non-compliance notices, impaired the Company's listing posture, and ultimately resulted in the loss of the Company's Nasdaq listing. The NextTrip merger was formally terminated in August 2023.

**Causation and Damages**

Citrin's professional failures were the direct and proximate cause of the Sponsor's damages. As the entity that funded the Company's operations throughout the audit period, and that directly and foreseeably relied upon Citrin's clean governance-facing representations and audit opinion in continuing to advance funds, extend loans, purchase warrants, and pursue business combination opportunities, the Sponsor suffered substantial economic losses as a direct result of Citrin's negligence.

Citrin's conduct and its near-privity relationship with the Sponsor satisfies the standard of New York law governing accountant liability to non-clients. Citrin knew that its audit reports and governance-facing communications would be used by the Sponsor, as the SPAC's sole economic backer, to evaluate its continued funding obligations and investment decisions, and the Sponsor's reliance on Citrin's representations was direct, specific, and known to Citrin.

The Sponsor's current, documentable out-of-pocket losses include, without limitation:

(i) Private placement warrants: $8,875,000

(ii) Extension loans advanced to the Company: $2,530,000

(iii) Transaction, professional, and remediation costs: $9,560,000

(iv) Sponsor equity value impairment and lost transaction opportunity: $18,975,000

The Sponsor equity value impairment is an estimate. Plaintiff reserves the right to assert a materially larger claim, supported by market evidence and expert testimony, and to seek all relief available under applicable law.

**Relief Sought**

The relief sought is compensatory and consequential monetary damages, together with pre-judgment and post-judgment interest from May 2023, as well as costs, disbursements, and such other and further relief as this Court deems just and proper.

Upon your failure to appear, Plaintiff will seek entry of judgment against you by default in the sum of $39,940,000.00, which includes, but is not limited to, $20,965,000.00 in sunk, out-of-pocket costs and at least $18,975,000.00 in Sponsor equity and warrant impairment, together with pre-judgment and post-judgment interest from May 24, 2023, as well as costs, disbursements, and any other relief the Court deems just and proper.

Dated: March 31, 2026
New York, New York

**BRADFORD EDWARDS LLP**

By: [signature]
Denver G. Edwards
Attorneys for NeuroMind AI Corp.
f/k/a Genesis Growth Tech Acquisition Corp. and
Genesis Growth Tech, LLC

575 5th Avenue, 14th Floor
New York, New York 10017

**TO:**

**Citrin Cooperman & Company, LLP**

Attn: Glenn Cline, Deputy General Counsel
gcline@citrincooperman.com

50 Rockefeller Plaza
New York, New York 10020

SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK: COMMERCIAL DIVISION

**Plaintiff / Petitioner:**
NEUROMIND AI CORP. f/k/a GENESIS GROWTH TECH ACQUISITION CORPORATION and GENESIS GROWTH TECH, LLC,
**Defendant / Respondent:**
CITRIN COOPERMAN & COMPANY, LLP

## AFFIRMATION OF SERVICE

**Index No:**
**651945/2026**

I, John Habermehl affirm and say that I'm not a party herein, I'm over 18 years of age and reside in NY State. That on Fri, May 15 2026 AT 02:23 PM AT 283 WASHINGTON AVE, ALBANY, NY 12206 affirmant served the within NOTICE OF ELECTRONIC FILING, SUMMONS WITH NOTICE on CITRIN COOPERMAN & COMPANY LLP C/O CORPORATE SERVICE BUREAU INC

[ ] **Personal service delivery:** By delivering a true copy of each to said defendant, personally; deponent knew the person so served to be the person described as said defendant therein.

[X] **Corporate service delivery:** By serving the above on CITRIN COOPERMAN & COMPANY LLP C/O CORPORATE SERVICE BUREAU INC a domestic corporation, by delivering a true copy thereof to HEATHER MORDRONO who is the Intake clerk, a person authorized to accept service.

[ ] **Partnership service delivery:** By serving the above on ________ by delivering a true copy thereof to ________ ________ a person authorized to accept service.

[ ] **Substituted service delivery:** By delivering a true copy thereof to ________ a person of suitable age and discretion, at the actual place of business, dwelling house, or usual place of abode.

[ ] **Conspicuous service delivery:** by affixing a true copy of each to the door thereof, the deponent was unable with due diligence to find defendant, or a person of suitable age or discretion thereat.

[ ] **Mailing:** On deponent enclosed a copy of same in a postage-paid sealed wrapped properly addressed to at ________, First Class Envelope Marked "Personal and Confidential" and not indicating on the outside thereof, by return address or otherwise. that the communication is from an attorney or concerns an action against the person to be served and deposited said envelope in (a post office) official depository under the exclusive care and custody the United States Postal Services.

[ ] **Military Service:** Deponent further states upon information and belief that said person so served is not in the Military Service of State of New York or of the United States as that term is defined in either the State or in the Federal statutes.

**Additional Comments:**
1) Successful Attempt: May 15, 2026, 2:23 pm EDT at 283 WASHINGTON AVE, ALBANY, NY 12206 received by HEATHER MORDRONO.
The recipient confirmed they are authorized to accept

**Description:**
Age: 30-40 Skin Color: Caucasian Gender: Female Weight: 150-160
Height: 5'7" Hair: Black Relationship: Intake clerk
Other ________

[signature]

John Habermehl

Pursuant to NY CPLR § 2106. I affirm this 18 day of may 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, except as to matters alleged on information and belief and as to those matters I believe it to be true, and I understand that this document may be filed in an action or proceeding in a court of law.

UNDISPUTED LEGAL, INC., ONE WORLD TRADE CENTER, 85TH FLOOR NEW YORK, NY 10007 1420758-DCA

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| NEUROMIND AI CORP, f/k/a GENESIS GROWTH TECH ACQUISITION CORPORATION and GENESIS GROWTH TECH, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CITRIN COOPERMAN & COMPANY, LLP<br><br>Defendant. | Index No. 651945/2026<br><br>**NOTICE OF APPEARANCE** |

PLEASE TAKE NOTICE that the undersigned attorney, who is admitted to practice before this Court, hereby files this notice of appearance as counsel for defendant Citrin Cooperman & Company, LLP ("Citrin") further to the appearance previously noticed on June 12, 2026. Citrin does not waive and expressly reserves all rights, defenses, and objections, including its right to compel arbitration of claims asserted against it and to stay this action pursuant to CPLR Article 75 or otherwise.

Dated: July 7, 2026
New York, NY

Respectfully submitted,

*/s/Christina Prusak Chianese*
Christina Prusak Chianese

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
cchianese@sidley.com

*Attorney for Defendant Citrin Cooperman & Company, LLP*

**AFFIRMATION OF SERVICE**

I hereby affirm that on July 7, 2026, I electronically filed the foregoing with the clerk of court using the NYSCEF system, which will send notification of such filing to all counsel of record.

I affirm this 7 day of July, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, except as to matters alleged on information and belief and as to those matters I believe it to be true, and I understand that this document may be filed in an action or proceeding in a court of law.

*/s/ Christina Prusak Chianese*
Christina Prusak Chianese

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| GENESIS GROWTH TECH, LLC,<br><br>Plaintiff,<br><br>against<br><br>CITRIN COOPERMAN & COMPANY, LLP,<br><br>Defendant. | Index No.: 651945/2026<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Genesis Growth Tech, LLC (the "Sponsor"), by its attorneys Bradford Edwards LLP, for its Complaint against defendant Citrin Cooperman & Company, LLP ("Citrin"), alleges as follows:

## PRELIMINARY STATEMENT

1. This case is about an auditor that held a document proving it was wrong, and certified the opposite anyway.

2. Citrin was the independent registered public accounting firm for Genesis Growth Tech Acquisition Corp. (the "Company"), a special purpose acquisition company listed on the Nasdaq Global Market. The Sponsor was the Company's sole source of private capital. The Sponsor bought the founder shares. The Sponsor bought the private placement warrants. The Sponsor funded the Company's operating expenses. The Sponsor wired the money that bought the Company more time to complete a merger. Citrin knew all of this. Citrin said so in writing, listing "Sponsor seed equity" and "Related Party Transactions" among the audit areas it told the Company's Board it had examined.

3. On December 16, 2021, the night before Citrin was to release its audit of the Company's post-offering balance sheet, Citrin's Director on the engagement, Michael Jaeger,

wrote to the working group: "My biggest concern at the moment regards the confirmations. It sounds like we have no chance at all of confirming the operating account balance before tomorrow, and I'm getting a bit of a run around from CTS/JP Morgan on the trust account. We have some alternative options on the operating account, but we will absolutely need both the trust account and transfer agent (securities) confirmations back in order to release." (*See* the December 2021 working-group email chain, Exh. A, p. 3).

4. Citrin drew a line that night. For the trust account and the transfer agent, it would not release its opinion without confirmations in hand. For the operating account, it would rely on unspecified "alternative options." Citrin released. (*See* the December 2021 working group email-chain, Exh. A, p. 4).

5. The next afternoon, Citrin found out what its alternative options had missed. Company securities counsel emailed Jaeger, Citrin's Engagement Partner, and Citrin's self-designated SPAC Practice Leader, attaching the operating account's bank statement. The statement identified the account holder in capital letters as an affiliate of the sponsor. (*See* the BCGE Account Statement, Exh. B). That is not the Company. It is an affiliate of the Sponsor. Counsel added that the funds could not be traced because the account "was just opened with this from a separately funded account." (*See* the December 2021 working-group email chain, Exh. A, p. 1).

6. Citrin did nothing. It obtained no confirmation of the operating account then or at any time thereafter, though its own engagement letters promised "direct confirmation of certain assets and liabilities by correspondence with selected creditors and financial institutions." (*See* May 18, 2021 Engagement Agreement p. 3, annexed to Citrin's July 21, 2021 Required Communications, Exh. C). It made no related-party inquiry, though it had promised to evaluate

the Company's identification and disclosure of related-party transactions. It performed no follow-up procedure of any kind.

7. Four months later, on April 12, 2022, Citrin told the Company's Audit Committee that "[n]o material weaknesses were identified as a result of our audit procedures." (*See* Citrin's Audit Committee Communication dated April 12, 2022, Exh. D, p. 13). Three days after that, Citrin issued a clean audit opinion on financial statements that reported affiliate cash as Company cash. Over the following months Citrin issued three interim review reports certifying the same presentation. Every one of those statements was made with the December 17, 2021 bank statement sitting in the engagement partner's inbox. (*See* the December 2021 working-group email chain, Exh. A, p. 1; BCGE Account Statement, Exh. B).

8. Then, on May 15, 2023, Citrin reversed itself. In a letter to the Company's Audit Committee Chair and Chief Executive Officer, Citrin announced that it could no longer be associated with the audited 2021 financial statements or any of the 2022 interim financial statements, that the audit evidence it had obtained over the Company's cash was "not reliable," and that it had "concerns about the integrity of management." Citrin blamed the Company. (*See* Form 8-K dated May 15, 2023, Item 4.02(b) Non-Reliance, Exh. E, p. 3). But Citrin had known its cash evidence was deficient since the night of December 16, 2021, because Citrin's own Director said so in writing. And Citrin had known the account belonged to a Sponsor affiliate since the afternoon of December 17, 2021, because the Company's counsel sent it the statement. (*See* the December 2021 working-group email chain, Exh. A, p. 1). Citrin was not deceived.

9. The Sponsor is not suing over the identity of a bank account. The Sponsor is suing because Citrin lied about its own work. Whether Citrin sent confirmations, whether Citrin evaluated the related-party consequences of an affiliate-titled operating account, and whether

Citrin found control deficiencies were matters within Citrin's exclusive knowledge. The Sponsor could not audit the auditor. It could only read what Citrin certified, and act on it.

10. Acting on it, the Sponsor deployed $11,405,000 of its own capital, including $8,875,000 for private placement warrants and a further $2,530,000 wired into the Company's trust account in December 2022, eight months after Citrin's clean opinion and its assurance that no material weakness existed. Now, that capital is gone. The Company restated its financial statements. Nasdaq delisted it. Due to the uncertainty around the Sponsor, the merger it had funded the Company to complete never closed.

11. The Sponsor brings claims for fraud, gross negligence, and negligent misrepresentation. It seeks compensatory damages of not less than $11,405,000, punitive damages, interest, and costs.

## THE PARTIES

12. Plaintiff Genesis Growth Tech, LLC is a limited liability company formed under the laws of the Cayman Islands, with its registered office at Six, 2nd Floor, Cricket Square, P.O. Box 2681, Grand Cayman KY1-1111, Cayman Islands. The Sponsor was the sponsor of Genesis Growth Tech Acquisition Corp., a Cayman Islands exempted company that conducted an initial public offering on the Nasdaq Global Market in December 2021 and now operates as NeuroMind AI Corp.

13. Defendant Citrin Cooperman & Company, LLP, is a limited liability partnership organized under the laws of the State of New York. Citrin maintains its headquarters and principal place of business at 50 Rockefeller Plaza, New York, New York 10020, in New York County, where it has been located since October 2021. Citrin is a licensed independent certified public accounting firm registered with the Public Company Accounting Oversight Board and authorized

to audit the financial statements of issuers registered with the Securities and Exchange Commission.

## JURISDICTION, VENUE, AND GOVERNING LAW

14. This Court has jurisdiction over Citrin under CPLR 301 because Citrin is organized under New York law and maintains its headquarters and principal place of business in New York County.

15. Venue is proper in New York County under CPLR 503(a) and 503(c) because Citrin resides in New York County and because a substantial part of the events giving rise to these claims occurred there.

16. New York law governs each claim pleaded here. Citrin is a New York partnership. Citrin planned and performed the audit and review engagements at issue from its New York offices, and issued from New York each of the representations on which these claims rest. The conduct giving rise to these claims occurred in New York.

17. The Sponsor does not transact business in New York within the meaning of Section 808 of the Limited Liability Company Law and requires no authorization to do business in New York in order to maintain this action.

18. This action satisfies the monetary threshold for assignment to the Commercial Division under Rule 202.70(a) of the Uniform Rules for the Supreme and County Courts.

19. This action was commenced by the filing of a Summons with Notice on March 31, 2026.

20. The documents annexed as Exhibits A through E are incorporated by reference and form part of this pleading: Exhibit A, the December 2021 working-group email chain including the December 16, 2021 message of Michael Jaeger and the December 17, 2021 messages of Albert

W. Vanderlaan; Exhibit B, the BCGE account statement transmitted with that chain; Exhibit C, Citrin's Required Communications to the Board dated July 21, 2021; Exhibit D, Citrin's Audit Committee Communication dated April 12, 2022; Exhibit E, the Form 8-K, dated May 15, 2023 citing Citrin's letter dated May 15, 2023; and Exhibit F, the March 10, 2023 renewed Citrin Engagement Letter.

## THE SPONSOR ASSERTS NO CONTRACT CLAIM AND IS BOUND BY NO ARBITRATION AGREEMENT

21. The Sponsor is not a party to, and never signed, any engagement letter or other agreement with Citrin.

22. The Sponsor asserts no claim for breach of contract, no claim as a third-party beneficiary of any agreement between Citrin and the Company, and no claim that depends on the terms of any such agreement. Every claim pleaded here arises in tort from Citrin's own affirmative statements and from duties Citrin owed the Sponsor independent of contract. The Sponsor expressly disclaims any benefit under, and any right to enforce, the engagement letters between Citrin and the Company.

23. The engagement letters are pleaded here for one purpose only: as evidence of what Citrin represented it would do and did not do. The Sponsor seeks no relief under them.

## FACTUAL ALLEGATIONS

### A. Citrin Marketed Itself as a SPAC Audit Specialist and Identified the Sponsor as a Central Audit Subject

24. On May 18, 2021, the Company engaged Citrin to serve as its independent registered public accounting firm. Citrin priced the engagement in two phases. Phase One, approximately $15,000, covered the seed audit, responses to SEC comments, and consents. Phase Two, approximately $19,000, covered consents, a comfort letter, a bring-down letter, and audits

in connection with Current Reports on Form 8-K. (*See* May 18, 2021 Engagement Agreement, p. 7, annexed to Citrin's July 21, 2021 Required Communications, Exh. C).

25. Every deliverable Citrin priced exists to support a public securities offering. Citrin knew from the first day of the engagement that the Company would file its work product with the Securities and Exchange Commission and that the parties funding the transaction would rely on it.

26. Citrin staffed the engagement with a team it presented as SPAC specialists: Joseph J. Puglisi, identified as "Audit Partner – SPAC Practice Leader"; Christopher A. Brown, identified as "Engagement Partner"; Eric Diefenderfer, identified as "Audit Director – Private Equity/Capital Markets"; and Barbara Stofflet, identified as "Audit Partner – Engagement Quality Reviewer." (*See* July 21, 2021 Required Communications, Exh. C, p. 2).

27. The financial statements Citrin audited in 2021 covered the period from March 17, 2021, the Company's inception, through May 26, 2021. During that period the Company conducted essentially one substantive transaction: the Sponsor's purchase of 7,187,500 Class B founder shares for $25,000. (*See* July 21, 2021 Required Communications, Exh. C, p. 6). The Sponsor was not incidental to that audit. The Sponsor was its subject.

### B. Citrin Told the Board in Writing That It Had Examined the Sponsor's Transactions and Found Nothing Wrong

28. On July 21, 2021, Citrin delivered a formal written presentation captioned "Required Communications" to the Company's Board of Directors. Citrin made the presentation under professional standards governing an auditor's communications with those charged with governance. (*See* Citrin's July 21, 2021 Required Communications, Exh. C).

29. Citrin listed among its "Areas of Focus": "Related party disclosures," "Sponsor seed equity," and "Related Party Transactions." (*See* Citrin's July 21, 2021 Required Communications, Exh. C, p. 5).

30. Citrin represented that it had performed specific procedures in those areas, including that "[a]greements were obtained to support the Company's related party transactions" and that the equity had been "traced to subscription agreement and the equity purchase agreement." (*See* Citrin's July 21, 2021 Required Communications, Exh. C, p. 5).

31. Citrin identified in its own audit scope the specific channels through which the Sponsor would fund the Company: the Sponsor's purchase of 7,187,500 Class B shares; the Sponsor's purchase of private placement warrants; Sponsor loans of up to $500,000; and affiliate support services of approximately $10,000 per month following the initial public offering. (*See* Citrin's July 21, 2021 Required Communications, Exh. C, p. 6). Citrin also recorded that a Sponsor affiliate paid "certain expenses on behalf of the Company." (*See* Citrin's July 21, 2021 Required Communications, Exh. C, p. 5). When an affiliate pays a registrant's expenses, the registrant owes the affiliate the amount paid. That obligation is a related-party payable required to be recorded and disclosed under professional standards governing related-party transactions. Citrin documented the transaction and never tested for the payable it created.

32. Citrin then reported to the Board, among other things:

a. Unrecorded adjustments: "CURRENT PERIOD: None noted." (*See* Citrin's July 21, 2021 Required Communications, Exh. C, p. 8).

b. Disagreements with management: "We are pleased to report that no disagreements with management arose during the course of our audit." (*See* Citrin's July 21, 2021 Required Communications, Exh. C, p. 11).

c. Significant issues discussed with management: "None." (*See* Citrin's July 21, 2021 Required Communications, Exh. C, p. 11).

d. Difficulties encountered during the audit: "No significant difficulties noted." (*See* Citrin's July 21, 2021 Required Communications, Exh. C, p. 11).

e. Internal control: "No deficiencies or material weaknesses were identified as a result of our audit procedures." (*See* Citrin's July 21, 2021 Required Communications, Exh. C, p. 10).

f. Related parties: Citrin represented that it had "evaluated the Company's identification of, accounting for, and disclosure of the Company's transactions with related parties as required by professional standards," and that it "noted no related parties or related party relationships or transactions that were previously undisclosed." (*See* Citrin's July 21, 2021 Required Communications, Exh. C, p. 12).

33. Citrin further represented that it had read the Form S-1 registration statement to determine whether the information in it was materially inconsistent with the financial statements. (*See* Citrin's July 21, 2021 Required Communications, Exh. C, p. 12).

**C. Citrin Promised, in Writing, to Confirm Cash Directly With the Bank**

34. Citrin committed in its engagement letters that its audit procedures would include "direct confirmation of certain assets and liabilities by correspondence with selected creditors and financial institutions." (*See* May 18, 2021 Engagement Agreement, p. 3, annexed to Citrin's July 21, 2021 Required Communications, Exh. C).

35. Citrin further committed that it would "communicate in writing to the audit committee and management all material weaknesses and significant deficiencies" identified while performing the audit, that it would evaluate the Company's identification, accounting for, and disclosure of related-party relationships and transactions, and that it would communicate to the audit committee matters requiring material modification that came to its attention during interim reviews. (*See* May 18, 2021 Engagement Agreement, p. 4, annexed to Citrin's July 21, 2021 Required Communications, Exh. C).

36. Citrin also recorded the mechanics of the confirmation process it promised: "[W]e understand that the Company will prepare all cash and other confirmations we request." Citrin requested none as to the operating account.

37. Citrin repeated each of these commitments in a further engagement letter dated March 10, 2023, addressed to the Company's Audit Committee Chair and Chief Executive Officer. (*See* Citrin's renewed engagement letter, dated March 10, 2023, Exh. F).

**D. Citrin Worked Directly Alongside the Sponsor and Its Counsel Throughout the Offering**

38. From at least December 2, 2021, Citrin participated in a continuous working-group email thread with the Company's securities counsel at Orrick, Herrington & Sutcliffe LLP, the Company's accounting advisors at Williams Marston LLC and Chord Advisors, LLC, and the Sponsor's principal, who appeared by name on every message. (*See* December 2021 working-group email chain, Exh. A).

39. Citrin's Director, Michael Jaeger, drove that correspondence. He circulated audit comments and running open-item lists. He requested documents. He asked questions and received answers. On December 17, 2021, he reconciled the balance "due from Sponsor," adding three wire amounts and asking counsel whether a further wire existed to reach a total of $2,325,000. (*See* December 2021 working-group email chain, Exh. A, p. 1). Citrin was not a distant recipient of management's work product. Citrin was core to the transaction, in daily written contact with the Sponsor's principal and the Sponsor's counsel, working on Sponsor-specific balances.

**E. December 16, 2021: Citrin States in Writing That It Cannot Confirm the Operating Account, and Releases Anyway**

40. The Company was required to file an audited post-closing balance sheet on Form 8-K within four business days of the offering. The Company engaged Citrin to audit that balance sheet, and the working group was preparing it in the days before the December 13, 2021 closing.

41. At 9:13 p.m. on December 16, 2021, Jaeger wrote to the working group, with the Sponsor's principal copied: "My biggest concern at the moment regards the confirmations. It

sounds like we have no chance at all of confirming the operating account balance before tomorrow, and I'm getting a bit of a run around from CTS/JP Morgan on the trust account. We have some alternative options on the operating account, but we will absolutely need both the trust account and transfer agent (securities) confirmations back in order to release." (*See* December 2021 working-group email chain, Exh. A, p. 3).

42. That message establishes four facts, in Citrin's own words and on its own timestamp. Citrin had no confirmation of the operating account. Citrin knew it had none. Citrin decided to substitute unspecified "alternative options" for the confirmation. And Citrin distinguished between accounts for which it would insist on confirmations before releasing an opinion, namely the trust account and the transfer agent, and the operating account, for which it would not.

43. Citrin released its opinion. It never obtained a confirmation of the operating account, then or in any subsequent audit or review during the seventeen months that followed.

**F. December 17, 2021: Citrin Is Handed the Account Title**

44. The Company completed its initial public offering on December 13, 2021, raising $220 million in gross proceeds, with $256,795,000 placed in trust. On December 21, 2021, the underwriters exercised the over-allotment option in full, generating an additional $33 million.

45. On December 17, 2021, at 18:41, Albert W. Vanderlaan, a partner at Orrick, Herrington & Sutcliffe LLP, acting as securities counsel in the transaction, sent an email captioned "RE: GGTA 8-K Comments and Open Items." (*See* December 2021 working-group email chain, Exh. A, p. 1).

46. The email was addressed to three Citrin professionals assigned to the engagement: Michael Jaeger, a Citrin Director working directly on the Company's engagement team;

Christopher Brown, Citrin's Engagement Partner; and Joseph Puglisi, Citrin's SPAC Practice Leader. The Sponsor's principal was copied.

47. The email was not an unsolicited transmission. It carried the reply designation "RE:" on a thread captioned "GGTA 8-K Comments and Open Items," and it opened by addressing Citrin's Director by name. Its content answered a question that had been asked about where the money in the account had come from. Citrin identified the issue. Citrin asked. Citrin received the answer. (*See* December 2021 working-group email chain, Exh. A, p. 1).

48. The email attached a file named "Initial funding statement credit.pdf." (*See* December 2021 working-group email chain, Exh. A, p. 1). The attachment was a statement from BCGE for account designation "BCGE 1816," denominated in U.S. dollars, reflecting a balance of $1,063,815.86 as of December 13, 2021. The statement was generated on December 17, 2021 at 18:33:29, eight minutes before it was sent to Citrin. (*See* BCGE Account Statement, Exh. B).

49. The account holder named on the face of the statement was an affiliate of the Sponsor. It was not the Company. (*See* BCGE Account Statement, Exh. B at Holder).

50. In the body of the email, Vanderlaan wrote that the account "was opened with that initial amount, as reflected in the attached," and that "[t]here's not really an ability to show this coming from somewhere since the account was just opened with this from a separately funded account." (*See* December 2021 working-group email chain, Exh. A, p. 1).

51. That statement told Citrin two things a competent auditor could not ignore. First, that the operating account was titled to an entity other than its audit client. Second, that the source of the funds in that account could not be traced. Each is a recognized indicator requiring expanded audit procedures under professional standards governing the confirmation process, related-party transactions, and the auditor's consideration of fraud.

52. Citrin performed no procedure in response. It sent no confirmation to BCGE. It made no further inquiry into the ownership of the account. It raised no related-party issue. It communicated nothing to the Audit Committee. Three Citrin professionals, including its Engagement Partner and the partner it designated to lead its SPAC practice, held the answer to their own question and did nothing with it.

**G. With That Document in Hand, Citrin Certified the Opposite**

53. On April 12, 2022, Citrin delivered a written Audit Committee Communication for the fiscal year 2021 audit. Citrin stated: "No material weaknesses were identified as a result of our audit procedures." (*See* April 12, 2022 Audit Committee Communication, Exh. D, p. 13).

54. On April 15, 2022, Citrin issued its audit report on the Company's fiscal year 2021 financial statements. Those financial statements reported cash held in the affiliate-titled BCGE account as *cash of the Company*. Citrin's opinion contained no qualification, no related-party disclosure regarding the operating account, and no control deficiency.

55. Citrin thereafter issued interim review reports for the quarters ended March 31, 2022, June 30, 2022, and September 30, 2022, including a review report dated September 23, 2022. Each covered financial statements presenting the same cash on the same basis.

56. Citrin made every one of these statements after December 17, 2021, and therefore after it possessed the bank statement identifying the account holder as a Sponsor affiliate and counsel's written acknowledgment that the funds could not be traced.

**H. The September 2022 Material Weakness Disclosed Nothing About Cash, Confirmations, or Related Parties**

57. On September 23, 2022, the Company filed an amended Form 10-Q for the quarter ended June 30, 2022 disclosing a material weakness in internal control over financial reporting.

The weakness concerned controls around the approval process for the Company's financial statements. Management identified it, and the Audit Committee discussed it with Citrin.

58. That disclosure said nothing about the operating account. It did not disclose that Citrin had never obtained a confirmation of that account. It did not disclose that the account was titled to a Sponsor affiliate. It did not disclose that cash was misstated, that a related-party relationship had gone unevaluated, or that any financial statement could not be relied upon. Citrin issued its review report on those same amended financial statements the same day and identified no such matter.

59. Nothing in the September 2022 disclosure alerted the Sponsor to the defect at issue in this action. To the contrary, a disclosure that identified a discrete approval-process control gap, accompanied by Citrin's contemporaneous review report, confirmed that Citrin had examined the Company's controls and found nothing further.

**I. Citrin Admits Its Audit Evidence Was Never Reliable**

60. On April 12, 2023, Citrin resigned as the Company's auditor, effective immediately, without prior notice.

61. On May 15, 2023, Citrin wrote to the Company's Audit Committee Chair and Chief Executive Officer. Citrin stated that it could no longer be associated with the audited financial statements for fiscal year 2021, which its own report dated April 15, 2022 had covered, or with the interim financial statements for the quarters ended March 31, June 30, and September 30, 2022, which its review report dated September 23, 2022 had covered. (*See* Form 8-K dated May 15, 2023, Item 4.02(b) Non-Reliance, Exh. E).

62. Citrin stated that the audit evidence it had obtained over the Company's cash account was ***"not reliable."*** Citrin further stated that it had "concerns about the integrity of

management." Citrin directed the Company to file a Current Report on Form 8-K under Item 4.02(b). (*See* Form 8-K dated May 15, 2023, Item 4.02(b) Non-Reliance, Exh. E)

63. Citrin's May 15, 2023 letter is an admission that the representations it made on April 12, 2022, April 15, 2022, and in each 2022 interim review report were false when made.

64. Citrin's attempt to attribute the failure to management does not withstand the record. Citrin did not learn of the affiliate-titled account from management in 2023. It was handed the bank statement by counsel on December 17, 2021, before it issued a single one of the opinions it later withdrew. (*See* December 2021 working-group email chain, Exh. A; BCGE Account Statement, Exh. B). Whatever management did or did not tell Citrin, Citrin possessed independent documentary notice and disregarded it.

65. MaloneBailey, LLP, the successor independent registered public accounting firm engaged on April 14, 2023, demanded a formal materiality analysis under Staff Accounting Bulletins No. 99 and No. 108. Calabrese Consulting, an accounting firm retained by management, prepared that analysis. MaloneBailey reviewed it.

66. MaloneBailey required a finding of qualitative materiality and directed that the Company restate the financial statements. On May 19, 2023, the analysis concluded that the financial statements as of December 31, 2021, March 31, 2022, June 30, 2022, and September 30, 2022 were misstated, that the misstatement gave rise to a material weakness, and that restatement was required.

67. Two independent professional firms, examining the same account and the same facts Citrin possessed in December 2021, reached the conclusion Citrin failed to reach. A successor auditor with no stake in the outcome determined that the treatment of the affiliate-titled operating account was materially misstated and could not stand. Citrin, holding counsel's written answer to

its own inquiry, had certified for two reporting years that it had found no related-party issue, no control deficiency, and no material weakness and had passed financial statements that omitted a related-party payable arising from a transaction Citrin had documented in its own communication to the Board.

68. On May 23, 2023, the Company filed an amended Current Report on Form 8-K under Item 4.02 announcing that the identified financial statements should no longer be relied upon. Citrin transmitted its Exhibit 16.1 letter to the Securities and Exchange Commission's Office of the Chief Accountant the same day.

**J. The Sponsor Relied on Citrin's Representations About Citrin's Own Work**

69. The Sponsor does not allege that it was unaware of the existence of the BCGE account, of the name in which it was titled, or of the confirmation difficulties Citrin described in December 2021. The Sponsor alleges that it was deceived about a different subject entirely: whether Citrin ever closed the gap it had identified.

70. What Citrin said in December 2021 was that it could not confirm the operating account balance in time for a filing deadline the following day, and that it would use alternative options for that filing. What Citrin did not say, then or ever, was that it would carry the gap forward through an annual audit and three quarterly reviews without closing it, or that the alternative options it substituted would produce evidence Citrin itself would later describe as not reliable.

71. Four months later, Citrin represented affirmatively that no material weakness had been identified through its audit procedures, and issued an unqualified opinion. Those statements represented that whatever could not be completed under deadline pressure in December 2021 had been completed in the annual audit. A reasonable party reading them would understand the December 2021 issue to have been resolved. It had not been.

72. Whether Citrin ultimately obtained a confirmation of the operating account, what any confirmation returned, what the "alternative options" consisted of, whether Citrin evaluated the related-party and disclosure consequences of an operating account titled to an affiliate, whether Citrin identified a control deficiency, and what professional conclusions Citrin reached were facts within Citrin's exclusive knowledge and control.

73. The Sponsor had no access to Citrin's workpapers, its confirmation correspondence, its risk assessments, or its internal conclusions. Citrin's workpapers are its property and are not available to a non-client. The Sponsor had no means, through the exercise of ordinary diligence or otherwise, of determining whether Citrin had performed any of the procedures it represented it had performed.

74. Only the auditor knows whether a gap was closed, whether an account title was investigated, whether it was material, whether it required disclosure, and whether it rendered financial statements unreliable. Citrin told the Sponsor, through formal governance communications and audit opinions, that it had asked those questions and answered them favorably. That is what the Sponsor relied on.

75. Citrin intended that reliance. It knew the Sponsor was the Company's only source of private capital. It knew, because it wrote it down, that the Sponsor would purchase private placement warrants, extend loans of up to $500,000, and fund monthly affiliate support. It knew a SPAC that loses its listing or restates its financials cannot complete a business combination and that the Sponsor's capital would be lost. (*See* July 21, 2021 Required Communications, Exh. C, p. 6; April 12, 2022 Audit Committee Communication, Exh. D, p. 9).

**K. Citrin's Representation of the Company Was Continuous**

76. Citrin served continuously as the Company's independent registered public accounting firm from May 18, 2021 through April 12, 2023.

77. During that period Citrin performed an uninterrupted sequence of professional services for a single, continuing purpose: the audit and review of the Company's financial statements as an SEC registrant. Those services included the 2021 seed audit, the July 21, 2021 governance communications (Exh. C), consents in connection with the Form S-1, the fiscal year 2021 annual audit, the April 12, 2022 Audit Committee Communication (Exh. D), the April 15, 2022 audit report, quarterly interim reviews through the September 23, 2022 review report, and audit committee communications for each interim period.

78. The Company renewed Citrin's engagement without interruption, most recently by engagement letter dated March 10, 2023, covering the fiscal year 2022 audit. (*See* Citrin's renewed engagement letter, dated March 10, 2023, Exh. F). At no point between May 18, 2021 and April 12, 2023 did Citrin cease to serve as the Company's auditor.

79. Citrin's professional obligations to the engagement did not end on April 12, 2023. Citrin continued to discharge auditor duties, including its May 15, 2023 non-reliance letter (Exh. E) and its May 23, 2023 letter to the Securities and Exchange Commission's Office of the Chief Accountant, both delivered in performance of continuing obligations arising from the same engagement.

**L. The Sponsor's Losses**

80. On December 8, 2021, in reliance on Citrin's July 21, 2021 Required Communications (Exh. C) and on Citrin's audit of the Company's financial statements, the Sponsor entered into the Private Placement Warrants Purchase Agreement. That agreement bound

the Sponsor irrevocably. It required the purchase to close simultaneously with the initial public offering and left the Sponsor no discretion to withdraw. The Sponsor committed at the moment it signed, on the strength of what Citrin had told the Company's Board five months earlier.

81. In reliance on Citrin's representations, the Sponsor advanced the following capital from its own funds:

a. On December 13 and December 21, 2021, pursuant to the December 8, 2021 Private Placement Warrants Purchase Agreement, $8,875,000 for 8,875,000 private placement warrants at $1.00 per warrant.

b. On December 9, 2022, $2,530,000 under a promissory note, deposited into the Company's trust account to extend the deadline to complete a business combination.

c. Throughout the period, working capital advances, affiliate support payments of approximately $10,000 per month, and sponsor loans, in amounts to be established at trial.

82. The December 9, 2022 deposit of $2,530,000 was made approximately eight months after Citrin told the Audit Committee that no material weakness existed and issued its clean opinion, and approximately five months before Citrin disclosed that its evidence over the Company's cash had never been reliable.

**M. Loss Causation: A Correctable Disclosure Item Became a Restatement Because Citrin Let It Compound**

83. Had Citrin obtained the confirmation it promised, BCGE would have reported that an affiliate of the Sponsor held the account designated "BCGE 1816", not by the Company. That is the single fact the confirmation process exists to establish, and the answer was unambiguous. Citrin did not need to obtain it from management. Counsel handed it to three Citrin professionals on December 17, 2021. (*See* December 2021 working-group email chain, Exh. A, p. 1).

84. Had Citrin acted on that answer in December 2021 or at the annual audit in April 2022, the correction would have been routine. (*See* December 2021 working-group email chain,

Exh. A, p. 1; April 12, 2022 Audit Committee Communication, Exh. D). The cash would have been reclassified. The related-party relationship would have been disclosed. A control deficiency would have been noted and remediated. Each of those is an ordinary current-period correction that registrants make without incident. None of them requires a restatement, because nothing filed at that point depended on the erroneous presentation.

85. A restatement becomes necessary only after financial statements have been filed and relied upon. Every additional opinion Citrin issued extended the misstatement into another reported period. By the time Citrin resigned in April 2023, the error was embedded in an audited fiscal year and three reviewed quarters, all on file with the Commission and all bearing Citrin's name. At that point no current-period correction was available. Restatement was the only remaining remedy. The seventeen-month delay, not the underlying accounting, is what foreclosed the ordinary fix.

86. The restatement, in turn, produced every loss the Sponsor pleads. It forced the non-reliance Form. (*See* Form 8-K dated May 14, 2023, Item 4.02(b) Non-Reliance, Exh. E). That filing left the Company unable to complete its periodic reports on time, which drew successive Nasdaq deficiency notices, a trading suspension on July 25, 2023, and delisting effective November 30, 2023. The business combination the Sponsor had funded the Company to pursue was terminated in August 2023. Each dollar the Sponsor advanced was lost. Had Citrin closed the gap it identified on December 16, 2021, none of that would have occurred, and the Sponsor would not have deployed the capital it deployed.

**N. The Sponsor's Injury Is Its Own**

87. The claims pleaded here belong to the Sponsor alone. The Sponsor does **not** seek to recover for any diminution in the value of its equity interest in the Company. It does **not** seek

to recover any loss sustained by the Company. It sues in its own right, not derivatively, and asserts no claim or right belonging to the Company.

88. The injury the Sponsor pleads is its own out-of-pocket loss: capital the Sponsor advanced from its own treasury, in reliance on statements Citrin made to the Sponsor about the work Citrin had performed, which the Sponsor would not have advanced had those statements been true.

89. That injury is independent of, and does not duplicate, any injury to the Company. Had Citrin disclosed in April 2022 (Exh. D) what it knew in December 2021 (Exh. A), the Sponsor would not have wired $2,530,000 into the trust account in December 2022. That loss is the Sponsor's, regardless of what the Company did or did not recover, and regardless of the value of any equity the Sponsor holds.

90. The Company has separately asserted claims against Citrin in a proceeding to which the Sponsor is not a party, seeking different categories of damages. The Sponsor seeks no recovery duplicative of any relief sought or obtained by the Company.

## FIRST CAUSE OF ACTION
## (Fraud)

91. The Sponsor repeats and realleges each preceding paragraph as if fully set forth herein.

92. Citrin made the following material misrepresentations of existing fact, each after it knew it had not confirmed the operating account:

a. In December 2021, in its audit report on the Company's post-closing balance sheet filed on Form 8-K, that Citrin had audited those financial statements in accordance with the standards of the Public Company Accounting Oversight Board and that they presented the Company's financial position fairly in all material respects, when Citrin had released without confirming the operating account and had stated internally the night before that it had no chance of doing so.

b. On April 12, 2022, in a written Audit Committee Communication, that "[n]o material weaknesses were identified as a result of our audit procedures." (*See* April 12, 2022 Audit Committee Communication, Exh. D, p. 13).

c. On April 15, 2022, in its audit report on the Company's fiscal year 2021 financial statements, those financial statements presented the Company's financial position fairly in all material respects in conformity with generally accepted accounting principles, and that Citrin had conducted its audit in accordance with the standards of the Public Company Accounting Oversight Board.

d. In each interim review report for the quarters ended March 31, June 30, and September 30, 2022, including the report dated September 23, 2022, that Citrin was not aware of any material modifications that should be made to the reviewed financial statements.

93. Each statement was false. The financial statements *reported affiliate cash as Company cash*. Citrin had performed no confirmation of the operating account and possessed no reliable audit evidence over it. Citrin had identified no related-party issue and no control deficiency because it had looked at neither. The financial statements omitted the related-party payable arising from the affiliate's payment of Company expenses, the same transaction Citrin recorded in its July 21, 2021 communication to the Board. (*See* July 21, 2021 Required Communications, Exh. C).

94. Citrin knew these statements were false when it made them, or made them with reckless disregard for their truth. On the night of December 16, 2021, Citrin's Director wrote that Citrin had "no chance at all of confirming the operating account balance" and would proceed on "alternative options." (*See* December 2021 working-group email chain, Exh. A, p. 3). On the afternoon of December 17, 2021, Citrin's Director, Engagement Partner, and SPAC Practice Leader received a bank statement identifying the operating account holder as an affiliate of the Sponsor and a written acknowledgment from counsel that the source of the funds could not be traced. (*See* December 2021 working-group email chain, Exh. A, p. 1). Citrin performed no procedure in response and never disclosed what it had been given. Four months later it certified that it had found nothing.

95. Citrin's own words establish its knowledge. On May 15, 2023, Citrin acknowledged that its audit evidence over cash was "not reliable." (*See* Form 8-K dated May 14, 2023, Item 4.02(b) Non-Reliance, Exh. E, p. 3). That condition did not arise in 2023. It arose on December 16, 2021, when Citrin's Director wrote that Citrin had no chance of confirming the operating account and would release on alternative options instead. (*See* December 2021 working-group email chain, Exh. A, p. 3). Citrin knew in December 2021 exactly what it announced in May 2023.

96. Each misrepresentation was material. A successor auditor with no interest in the outcome, reviewing the same facts, determined that the treatment of the affiliate-titled operating account was materially misstated and required restatement of two years of financial statements. Independent of that determination, whether an auditor performed the confirmation procedures it promised, evaluated related-party relationships, and identified control deficiencies is material to any party deciding whether to commit capital to the audited enterprise.

97. Citrin intended the Sponsor to rely. Citrin identified the Sponsor by name in its audit scope, catalogued the specific instruments through which the Sponsor would fund the Company, and delivered its representations in formal governance communications and public audit reports for the purpose of informing capital decisions concerning the Company.

98. The Sponsor justifiably relied. The matters misrepresented, namely the procedures Citrin performed, the evidence Citrin obtained, and the professional conclusions Citrin reached, lay exclusively within Citrin's knowledge and were not discoverable by the Sponsor through any diligence available to it.

99. The Sponsor was damaged. In reliance on Citrin's post-December 17, 2021 representations, the Sponsor advanced not less than $2,530,000 into the Company's trust account

on December 9, 2022, together with further working capital advances, affiliate support payments, and sponsor loans made after April 12, 2022, in amounts to be established at trial. That capital was lost.

100. Citrin's conduct was willful, wanton, and undertaken in conscious disregard of the rights of those it knew would rely on its work, including the Sponsor and the investing public that an auditor of an SEC registrant is engaged to protect. Punitive damages are warranted.

**SECOND CAUSE OF ACTION**
**(Gross Negligence)**

101. The Sponsor repeats and realleges each preceding paragraph as if fully set forth herein.

102. Citrin owed the Sponsor a duty of care. Citrin knew the identity of the Sponsor, knew the specific purpose for which its audit work would be used, identified the Sponsor's transactions as central subjects of its audit, and dealt directly with the Sponsor's principal and its securities counsel in the course of the engagement, including through the December 17, 2021 email exchange. (*See* December 2021 working-group email chain, Exh. A).

103. Citrin's conduct fell so far below the applicable standard of care as to evince a reckless disregard for the rights of others:

a. Citrin promised in writing, in successive engagement letters, to obtain direct confirmation of assets by correspondence with financial institutions, and never obtained a confirmation of the account through which its client paid its operating expenses. Cash is the most readily confirmable balance in any audit.

b. Citrin recognized the gap and documented it. Its Director wrote on December 16, 2021 that Citrin had "no chance at all" of confirming the operating account and would rely on "alternative options." (*See* December 2021 working-group email chain, Exh. A, p. 3). Citrin then released its opinion.

c. Citrin applied a standard to the trust account and the transfer agent that it declined to apply to the operating account, stating that it would "absolutely need" those confirmations "in order to release" while releasing without the operating account confirmation. (*See* December 2021 working-group email chain, Exh. A, p. 3).

d. Citrin received a bank statement naming an entity other than its client as the account holder, and asked no question about it. (*See* December 2021 working-group email chain, Exh. A, p. 1; BCGE Account Statement, Exh. B).

e. Citrin was told in writing by counsel that the source of the funds could not be traced, and performed no procedure in response. (*See* December 2021 working-group email chain, Exh. A, p. 1).

f. Citrin never closed the gap. It obtained no confirmation of the operating account in the annual audit or in any of the three subsequent quarterly reviews, across seventeen months.

g. Citrin certified, for two successive reporting years, that it had evaluated the Company's related-party relationships and identified no previously undisclosed related party or related-party transaction, while holding a document establishing that the Company's operating account was titled to an affiliate. Citrin's own July 21, 2021 communication recorded that a Sponsor affiliate paid the Company's expenses. (*See* July 21, 2021 Required Communications, Exh. C, p. 6). The related-party payable transaction created never appeared in any financial statement Citrin certified.

h. Citrin reported "No significant difficulties noted" and "No deficiencies or material weaknesses" in circumstances in which, on its own contemporaneous account, it lacked reliable evidence over the Company's cash. (*See* July 21, 2021 Required Communications, Exh. C, pp. 10-11).

104. These were not errors of judgment within a range of professional disagreement. They were the complete failure to perform a promised, elementary, and mandatory audit procedure, followed by affirmative certification that the procedure had produced a clean result.

105. As a direct and proximate result, the Sponsor lost capital of not less than $11,405,000, together with further advances, affiliate support payments, and sponsor loans in amounts to be established at trial.

106. Citrin's conduct was so reckless and wanting in care as to warrant punitive damages.

**<u>THIRD CAUSE OF ACTION</u>**
**(Negligent Misrepresentation)**

107. The Sponsor repeats and realleges each preceding paragraph as if fully set forth herein.

108. A relationship approaching privity existed between Citrin and the Sponsor. Citrin was aware that its audit work and governance communications would be used for a particular purpose, namely the capitalization and operation of a publicly listed special purpose acquisition company. Citrin knew the Sponsor was the party that would supply that capital, and identified the Sponsor and its transactions by name in its own audit scope. And Citrin engaged in extensive conduct linking it to the Sponsor: for weeks surrounding the offering, Citrin's Director, Engagement Partner, and SPAC Practice Leader corresponded on a working-group thread that included the Sponsor's principal by name on every message; Citrin requested documents and posed questions that the Sponsor's counsel answered; and Citrin reconciled Sponsor-specific balances, including the amount "due from Sponsor," in direct written exchanges with the Sponsor's counsel.

109. Citrin possessed unique and specialized expertise as a PCAOB-registered auditor of SEC registrants and held itself out as a SPAC audit specialist, designating one of its partners as "SPAC Practice Leader." The Sponsor was entitled to rely on that expertise.

110. Citrin supplied false information. Its July 21, 2021 Required Communications (Exh. C), its April 12, 2022 Audit Committee Communication (Exh. D), its April 15, 2022 audit

report, and its 2022 interim review reports each represented that Citrin had performed procedures it had not performed and had reached conclusions the evidence did not support.

111. Citrin failed to exercise reasonable care in obtaining and communicating that information. It omitted the single confirmation procedure that would have revealed the defect, disregarded documentary evidence placed directly in the hands of its engagement partners, and communicated conclusions it had no basis to reach.

112. The Sponsor reasonably relied on that information. On December 8, 2021, relying on Citrin's July 21, 2021 Required Communications (Exh. C) and its audit of the Company's financial statements, the Sponsor irrevocably committed to purchase $8,875,000 in private placement warrants. On December 9, 2022, relying on Citrin's April 12, 2022 Audit Committee Communication (Exh. D) and its April 15, 2022 audit report, the Sponsor advanced $2,530,000 into the Company's trust account. Throughout, the Sponsor funded working capital advances, affiliate support payments, and sponsor loans on the same basis.

113. As a direct and proximate result, the Sponsor was damaged in an amount of not less than $11,405,000, to be established at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Genesis Growth Tech, LLC respectfully requests that this Court enter judgment in its favor and against defendant Citrin Cooperman & Company, LLP as follows:

a. On the First Cause of Action, compensatory damages of not less than $2,530,000, together with further amounts to be established at trial, and punitive damages;

b. On the Second Cause of Action, compensatory damages of not less than $11,405,000, together with further amounts to be established at trial, and punitive damages;

c. On the Third Cause of Action, compensatory damages of not less than $11,405,000, together with further amounts to be established at trial;

d. Prejudgment and post judgment interest at the statutory rate;

e. Costs and disbursements of this action; and

f. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: New York, New York
July 27, 2026

**BRADFORD EDWARDS LLP**

By: [signature]

Denver G. Edwards
575 Fifth Avenue, 14th Floor
New York, New York 10017
Telephone: 646-455-9044
dedwards@bradfordedwards.com

*Attorneys for Plaintiff*
*Genesis Growth Tech, LLC*

# EXHIBIT A

**Eyal Perez**

| | |
|---|---|
| **From:** | Vanderlaan, Albert <avanderlaan@orrick.com> |
| **Sent:** | vendredi, 17 décembre 2021 18:41 |
| **To:** | Jaeger, Michael; Oanh Truong; Brown, Christopher; Puglisi, Joseph |
| **Cc:** | Ghubril, Sami; Eyal Perez; Bonilla, Anjel |
| **Subject:** | RE: GGTA 8-K Comments and Open Items |
| **Attachments:** | Initial funding statement credit.pdf |

Michael,

The account was opened with that initial amount, as reflected in the attached. There's not really an ability to show this coming from somewhere since the account was just opened with this from a separately funded account.

Albert

**Albert W. Vanderlaan**
Partner
Orrick
T +1-617-880-2219
avanderlaan@orrick.com

---

**From:** Jaeger, Michael <mjaeger@citrincooperman.com>
**Sent:** Friday, December 17, 2021 12:08 PM
**To:** Vanderlaan, Albert <avanderlaan@orrick.com>; Oanh Truong <otruong@williamsmarston.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>
**Cc:** Ghubril, Sami <sghubril@orrick.com>; Eyal Perez <ep@genfunds.com>; Bonilla, Anjel <abonilla@orrick.com>
**Subject:** RE: GGTA 8-K Comments and Open Items

Hi Albert – all set on the note repayment. I'm coming up short on the due from Sponsor:

960,999 (file 17)
+ 500,185 (file 18)
+ 600,000 (file 16)
2,061,184

All amounts appear to be in USD. Is there another wire for $263,816 to bring it up to the full $2,325,000?

Thanks,
Mike

---

**From:** Vanderlaan, Albert <avanderlaan@orrick.com>
**Sent:** Friday, December 17, 2021 11:22 AM
**To:** Jaeger, Michael <mjaeger@citrincooperman.com>; Oanh Truong <otruong@williamsmarston.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>
**Cc:** Ghubril, Sami <sghubril@orrick.com>; Eyal Perez <ep@genfunds.com>; Bonilla, Anjel <abonilla@orrick.com>
**Subject:** RE: GGTA 8-K Comments and Open Items

Mike,

The debit/credits from the sponsor account are attached per our conversation. Due to the way the online banking is structured, we're having a hard time getting the items into one page, but the attached reflect

each of the debits from the sponsor account to fund the $3.125M and the debit for the repayment of the note. Please confirm this closes out this item. Thanks!

Best,
Albert

**Albert W. Vanderlaan**
Partner
Orrick
T +1-617-880-2219
avanderlaan@orrick.com

---

**From:** Jaeger, Michael <mjaeger@citrincooperman.com>
**Sent:** Friday, December 17, 2021 10:42 AM
**To:** Oanh Truong <otruong@williamsmarston.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>
**Cc:** Ghubril, Sami <sghubril@orrick.com>; Vanderlaan, Albert <avanderlaan@orrick.com>; Eyal Perez <ep@genfunds.com>; Bonilla, Anjel <abonilla@orrick.com>
**Subject:** RE: GGTA 8-K Comments and Open Items

Hi all,

See attached for updated open items as of 10:30am EST.

Thank you,
Mike

---

**From:** Oanh Truong <otruong@williamsmarston.com>
**Sent:** Friday, December 17, 2021 12:00 AM
**To:** Jaeger, Michael <mjaeger@citrincooperman.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>
**Cc:** Ghubril, Sami <sghubril@orrick.com>; Vanderlaan, Albert <avanderlaan@orrick.com>; Eyal Perez <ep@genfunds.com>; Bonilla, Anjel <abonilla@orrick.com>
**Subject:** RE: GGTA 8-K Comments and Open Items

Please see supports for #6 and 7 attached. They were already included in our email sent previously.

**Oanh Truong** | Senior Manager - Advisory
**WilliamsMarston LLC | Chord Advisors, LLC**
Cell: 714-622-8733

CHORD ADVISORS
FINANCIAL ACCOUNTING & ADVISORY

*A WilliamsMarston Company*

www.williamsmarston.com

---

**From:** Oanh Truong
**Sent:** Thursday, December 16, 2021 10:59 PM
**To:** 'Jaeger, Michael' <mjaeger@citrincooperman.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>
**Cc:** Ghubril, Sami <sghubril@orrick.com>; Vanderlaan, Albert <avanderlaan@orrick.com>; Eyal Perez <ep@genfunds.com>; Bonilla, Anjel <abonilla@orrick.com>; Samuel Lynn <slynn@williamsmarston.com>
**Subject:** RE: GGTA 8-K Comments and Open Items

Team,

Please kindly see the cumulative marked changes attached. Regarding the comment for the Redeemable shares, it is a policy footnote since we talked about how the shares were accounted for. We can only duplicate the disclosure to add it to the Commitments footnote but cannot move it out of Note 2. However, it seems duplicative and we prefer the current presentation.

Regarding the offering costs, total offering costs were $19.0, but only $18.2 mil was the costs allocated to Class A and the remaining costs were allocated to warrants, so the tables are correct.

**Oanh Truong** | Senior Manager - Advisory
**WilliamsMarston LLC | Chord Advisors, LLC**
Cell: 714-622-8733

CHORD ADVISORS
FINANCIAL ACCOUNTING & ADVISORY

*A WilliamsMarston Company*

www.williamsmarston.com

---

**From:** Jaeger, Michael <mjaeger@citrincooperman.com>
**Sent:** Thursday, December 16, 2021 9:13 PM
**To:** Oanh Truong <otruong@williamsmarston.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>
**Cc:** Ghubril, Sami <sghubril@orrick.com>; Vanderlaan, Albert <avanderlaan@orrick.com>; Eyal Perez <ep@genfunds.com>; Bonilla, Anjel <abonilla@orrick.com>; Samuel Lynn <slynn@williamsmarston.com>
**Subject:** [EXTERNAL] RE: GGTA 8-K Comments and Open Items

**This Message contains suspicious characteristics and has originated outside your organization.**

---

Hi all,

I've completed my initial review of the 8-K. Attached are comments through my review and a listing of open items through my review. The file is now in partner review and the warrant/Class B appraisals are in the review of our valuation team. We will advise of additional comments/questions as they arise.

My biggest concern at the moment regards the confirmations. It sounds like we have no chance at all of confirming the operating account balance before tomorrow, and I'm getting a bit of a run around from CTS/JP Morgan on the trust account. We have some alternative options on the operating account, but we will absolutely need both the trust account and transfer agent (securities) confirmations back in order to release. To the extent anyone on this chain is able to leverage a relationship at CTS to get those, please do.

Thank you,
Mike

---

**From:** Oanh Truong <otruong@williamsmarston.com>
**Sent:** Thursday, December 16, 2021 12:38 AM
**To:** Jaeger, Michael <mjaeger@citrincooperman.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>
**Cc:** Ghubril, Sami <sghubril@orrick.com>; Vanderlaan, Albert <avanderlaan@orrick.com>; Eyal Perez <ep@genfunds.com>; Bonilla, Anjel <abonilla@orrick.com>; Samuel Lynn <slynn@williamsmarston.com>
**Subject:** RE: GGAA Timing

Citrin team,

Please kindly see the revised draft and WB attached. All numbers are still the same, I just tried to present it in a clearer way.

Orrick team,

Please kindly send this clean draft to printer to Edgarize. We can make changes to the printer proof once available.

Thank you very much!

**Oanh Truong** | Senior Manager - Advisory
**WilliamsMarston LLC | Chord Advisors, LLC**
Cell: 714-622-8733

*A WilliamsMarston Company*

www.williamsmarston.com

---

**From:** Oanh Truong
**Sent:** Wednesday, December 15, 2021 8:27 PM
**To:** Jaeger, Michael <mjaeger@citrincooperman.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>
**Subject:** RE: GGAA Timing

Citrin team,

Please kindly see the draft 8K BS and all supporting docs for Genesis attached. I need to think through how to present the value of the shares issued to Nomura that is an offering costs but is also a contribution from the Sponsor since the Sponsor was the one that transferred the shares. Will keep you updated in a little bit if there is any changes.

Thank you very much!

**Oanh Truong** | Senior Manager - Advisory
**WilliamsMarston LLC | Chord Advisors, LLC**
Cell: 714-622-8733

*A WilliamsMarston Company*

www.williamsmarston.com

---

**From:** Jaeger, Michael <mjaeger@citrincooperman.com>
**Sent:** Wednesday, December 15, 2021 2:21 PM
**To:** Oanh Truong <otruong@williamsmarston.com>; Ghubril, Sami <sghubril@orrick.com>; Vanderlaan, Albert <avanderlaan@orrick.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>; Eyal Perez <ep@genfunds.com>

**Cc:** Bonilla, Anjel <abonilla@orrick.com>; Samuel Lynn <slynn@williamsmarston.com>
**Subject:** [EXTERNAL] RE: GGAA Timing

**This Message contains suspicious characteristics and has originated outside your organization.**

---

Thank you for the update Oanh.

Mike

---

**From:** Oanh Truong <otruong@williamsmarston.com>
**Sent:** Wednesday, December 15, 2021 3:20 PM
**To:** Jaeger, Michael <mjaeger@citrincooperman.com>; Ghubril, Sami <sghubril@orrick.com>; Vanderlaan, Albert <avanderlaan@orrick.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>; Eyal Perez <ep@genfunds.com>
**Cc:** Bonilla, Anjel <abonilla@orrick.com>; Samuel Lynn <slynn@williamsmarston.com>
**Subject:** Re: GGAA Timing

Michael,

I'm working through this and we are waiting for Scalar on the valuation. They said they would have that in the next hour and we hopefully can send the full package to you this evening.

Get Outlook for iOS

---

**From:** Jaeger, Michael <mjaeger@citrincooperman.com>
**Sent:** Wednesday, December 15, 2021 11:54:22 AM
**To:** Ghubril, Sami <sghubril@orrick.com>; Oanh Truong <otruong@williamsmarston.com>; Vanderlaan, Albert <avanderlaan@orrick.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>; Eyal Perez <ep@genfunds.com>
**Cc:** Bonilla, Anjel <abonilla@orrick.com>; Samuel Lynn <slynn@williamsmarston.com>
**Subject:** [EXTERNAL] RE: GGAA Timing

**This Message contains suspicious characteristics and has originated outside your organization.**

---

Hi all,

Just checking in on an ETA for the draft 8-K and the supporting workbook. We'd love to have these ASAP so that our audit doesn't have to come down to the wire on Friday. Please let us know when you get the chance.

Thanks,
Mike

**MICHAEL JAEGER**
Director
**TEL** 212.697.1000 x6078 | **FAX** 212.697.1004
50 ROCKEFELLER PLAZA, NEW YORK, NY 10020

Click Here to send me files securely
mjaeger@citrincooperman.com | CITRINCOOPERMAN.COM

**We are excited to announce that as of October 1, 2021, our new address is:**

50 Rockefeller Plaza, New York, NY 10020
Please update your records.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

Any conclusions reached in this e-mail or any of its attachments are based on stated facts and current tax law. Any change in facts or current tax law can have a significant impact on the conclusions reached.

CONFIDENTIALITY NOTICE: This email and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution, storing or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify sender immediately by replying to the sender and delete this copy and the reply from your system. Thank you for your cooperation.

---

**From:** Ghubril, Sami <sghubril@orrick.com>
**Sent:** Tuesday, December 14, 2021 11:55 AM
**To:** Oanh Truong <otruong@williamsmarston.com>; Vanderlaan, Albert <avanderlaan@orrick.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>; Jaeger, Michael <mjaeger@citrincooperman.com>; Eyal Perez <ep@genfunds.com>
**Cc:** Bonilla, Anjel <abonilla@orrick.com>; Samuel Lynn <slynn@williamsmarston.com>
**Subject:** RE: GGAA Timing

Outstanding Orrick invoices attached.

---

**From:** Ghubril, Sami
**Sent:** Tuesday, December 14, 2021 9:50 AM
**To:** 'Oanh Truong' <otruong@williamsmarston.com>; Vanderlaan, Albert <avanderlaan@orrick.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>; Jaeger, Michael <mjaeger@citrincooperman.com>; Eyal Perez <ep@genfunds.com>
**Cc:** Bonilla, Anjel <abonilla@orrick.com>; Samuel Lynn <slynn@williamsmarston.com>
**Subject:** RE: GGAA Timing

Hi Oanh, please see attached and below. The rest will follow.

---

**From:** Oanh Truong <otruong@williamsmarston.com>
**Sent:** Tuesday, December 14, 2021 2:04 AM
**To:** Vanderlaan, Albert <avanderlaan@orrick.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>; Ghubril, Sami <sghubril@orrick.com>; Jaeger, Michael <mjaeger@citrincooperman.com>; Eyal Perez <ep@genfunds.com>
**Cc:** Bonilla, Anjel <abonilla@orrick.com>; Samuel Lynn <slynn@williamsmarston.com>
**Subject:** RE: GGAA Timing

All,

Following on the request list below. Please send these to us ASAP. Here is the list in more details:

1. Copy of all invoices received, or estimate of expenses as of **December 13, 2021** if invoices are not yet sent for:
   a. Orrick (Orrick team, please also send us the list of all payments you have received for the GGAA to date as well as confirming your outstanding billed balance and unbilled fees as of 12/13)
   b. Citrin Attached
   c. Continental Attached
   d. Printer fees Attached
   e. legal fees in connection with FINRA matter/ reimbursement to underwriters Attached
   f. D&O, if available Attached
   g. Maples fees – already reached out to them
2. All bank statements and screenshot of bank activities for the SPAC – GGAA - from inception to date (should show the working capital from closing of IPO received)
3. Breakdown of details that made up for the note balance. Please include the dates each payments were made. Please also arrange for repayment of this if it hasn't been repaid.
4. Schedule of funds flow
5. Draft 8K
6. Valuation – please finalize on the engagement with Scalar ASAP Attached EL

**Oanh Truong** | Senior Manager - Advisory
**WilliamsMarston LLC | Chord Advisors, LLC**
Cell: 714-622-8733

CHORD ADVISORS
FINANCIAL ACCOUNTING & ADVISORY

*A WilliamsMarston Company*

www.williamsmarston.com

---

**From:** Oanh Truong <otruong@williamsmarston.com>
**Sent:** Thursday, December 9, 2021 7:21 PM
**To:** Vanderlaan, Albert <avanderlaan@orrick.com>; Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>; Ghubril, Sami <sghubril@orrick.com>; Jaeger, Michael <mjaeger@citrincooperman.com>; Eyal Perez <ep@genfunds.com>
**Cc:** Bonilla, Anjel <abonilla@orrick.com>; Samuel Lynn <slynn@williamsmarston.com>
**Subject:** Re: GGAA Timing

To clarify on #6, where it said "the valuation of founder shares issued to anchor investors" should say "the valuation of founder shares issued to Nomura". Please ensure to have valuation for this done upon closing of IPO as well.

Thank you very much!

Get Outlook for iOS

---

**From:** Oanh Truong <otruong@williamsmarston.com>
**Sent:** Thursday, December 2, 2021 4:43 PM
**To:** Vanderlaan, Albert; Brown, Christopher; Puglisi, Joseph; Ghubril, Sami; Jaeger, Michael; Eyal Perez
**Cc:** Bonilla, Anjel; Samuel Lynn
**Subject:** RE: GGAA Timing

Great news!

FYI, we will need to prepare for the 8K post IPO audit that will be due within 4 days after closing. In order for us to prepare for the 8K, please kindly send us the following items ASAP upon closing:

1- Copy of all invoices received, or estimate of expenses if invoices are not yet sent (including but not limited to Orrick, warrant valuation fees, Continental, printer fees, D&O, legal fees in connection with FINRA matter/ reimbursement to underwriters, Citrin, email support or wire memo for FINRA/SEC fees paid, etc)
2- All bank statements and screenshot of bank activities from 1/1 up to the end of the closing date
3- Confirm Trust balance
4- Any expenses/ T&E to be reimbursed to the management team?
5- Breakdown of details that made up for the note balance. When did we repay this note? Please arrange for repayment before filing if you haven't done so.
6- **IMPORTANT**: *Warrant valuation* as of the IPO closing date (even though this is equity-classified warrants, we would still need the fair value of the warrants at initial issuance to allocate the proceeds for disclosure purpose. You only need to do this at initial issuance), *valuation of the over-allotment* if it was not exercised in full upon closing of IPO; *valuation of the founder shares issued to anchor investors,* if applicable.
7- Share transfer agreements to directors or management, if any.
8- Schedule of funds flow
9- Draft 8K

Thank you very much!

**Oanh Truong** | Senior Manager - Advisory
**WilliamsMarston LLC | Chord Advisors, LLC**
Cell: 714-622-8733

CHORD ADVISORS
FINANCIAL ACCOUNTING & ADVISORY

*A WilliamsMarston Company*

www.williamsmarston.com

---

**From:** Vanderlaan, Albert <avanderlaan@orrick.com>
**Sent:** Thursday, December 2, 2021 8:10 AM
**To:** Brown, Christopher <cabrown@citrincooperman.com>; Puglisi, Joseph <jpuglisi@citrincooperman.com>; Ghubril, Sami <sghubril@orrick.com>; Jaeger, Michael <mjaeger@citrincooperman.com>
**Cc:** Bonilla, Anjel <abonilla@orrick.com>; Oanh Truong <otruong@williamsmarston.com>; Samuel Lynn <slynn@williamsmarston.com>
**Subject:** [EXTERNAL] GGAA Timing

**This Message contains suspicious characteristics and has originated outside your organization.**

---

WilliamsMarston and Citrin Teams – Just a heads up that it is looking like we'll be pricing the GGAA SPAC next week. Please be on the lookout for updates over the next few days.

Best,
Albert

**Albert W. Vanderlaan**
Partner
Orrick
T +1-617-880-2219
avanderlaan@orrick.com

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

Transmitted information and data, inclusive of attachments, may contain confidential and/or privileged material and is only intended for the person or entity to which it is addressed. Any dissemination, retransmission, review or other use of, or taking of any action in reliance upon this transmitted information and data by any persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. Should this email include tax related advice or information, this email and its contents is limited to the matters specifically addressed herein. This email is not intended to address other potential tax consequences, nor the potential application of tax penalties to this or any other matter. If you received this in error, please contact the sender and delete the material from any computer.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

Transmitted information and data, inclusive of attachments, may contain confidential and/or privileged material and is only intended for the person or entity to which it is addressed. Any dissemination, retransmission, review or other use of, or taking of any action in reliance upon this transmitted information and data by any persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. Should this email include tax related advice or information, this email and its contents is limited to the matters specifically addressed herein. This email is not intended to address other potential tax consequences, nor the potential application of tax penalties to this or any other matter. If you received this in error, please contact the sender and delete the material from any computer.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Transmitted information and data, inclusive of attachments, may contain confidential and/or privileged material and is only intended for the person or entity to which it is addressed. Any dissemination, retransmission, review or other use of, or taking of any action in reliance upon this transmitted information and data by any persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. Should this email include tax related advice or information, this email and its contents is limited to the matters specifically addressed herein. This email is not intended to address other potential tax consequences, nor the potential application of tax penalties to this or any other matter. If you received this in error, please contact the sender and delete the material from any computer.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Transmitted information and data, inclusive of attachments, may contain confidential and/or privileged material and is only intended for the person or entity to which it is addressed. Any dissemination, retransmission, review or other use of, or taking of any action in reliance upon this transmitted information and data by any persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. Should this email include tax related advice or information, this email and its contents is limited to the matters specifically addressed herein. This email is not intended to address other potential tax consequences, nor the potential application of tax penalties to this or any other matter. If you received this in error, please contact the sender and delete the material from any computer.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

# EXHIBIT B

**Banque Cantonale de Genève**
PO Box 2251 - 1211 Geneva 2

Telephone +41 (0)58 211 21 00
VAT no. [redacted]
Clearing no. [redacted]
BIC/SWIFT [redacted]

BCGE

| | |
|---|---|
| **Date/time** | 17.12.2021/18:33:29 |
| **Account** | / USD |
| **Designation** | BCGE 1816 Account |
| **Holder** | GENESIS [redacted] |

## Account statement

| | | |
|---|---|---|
| **Balance 13.12.2021** | **USD** | **1'063'815.86** |
| **Date from** | 13.12.2021 | |
| **Date to** | 13.12.2021 | |

| Date | Posting text | Value | Debit | Credit | Balance USD |
|---|---|---|---|---|---|

# EXHIBIT C


CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS
PRESENTATION
to the Board of Directors of
Genesis Growth Tech Acquisition Corp.
Audit Results for the Financial Statements
For the period March 17, 2021 (inception) through May 26, 2021
Communicated July 21, 2021- prior to release

# Citrin Cooperman Engagement Team

## Audit Team

- Joseph J. Puglisi, Audit Partner – SPAC Practice Leader
- Christopher A. Brown – Engagement Partner
- Eric Diefenderfer, Audit Director – Private Equity/Capital Markets
- Barbara Stofflet, Audit Partner – Engagement Quality Reviewer



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Our responsibilities

The responsibilities of those Charged with Governance, Management and Citrin Cooperman were previously communicated in our engagement letter dated May 18, 2021. Please refer to Schedule 1 attached to this presentation.

**Status of the Audit: substantially complete with the following open items:**

- Engagement Quality Review: substantially complete
- Signed Management Representation Letter



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Our responsibilities

## Required communications

| | WHEN DELIVERED |
|---|---|
| **PCAOB COMMUNICATIONS** | |
| Independence and retention matters | Prior to acceptance |
| Our responsibilities under PCAOB standards | Prior to commencing services |
| Fraud and illegal acts | When event becomes known |
| Material weaknesses and significant deficiencies | Prior to report issuance |
| Other internal control deficiencies | End of audit |
| Significant accounting policies, judgments, and estimates | End of audit |
| Our judgments about the quality of accounting practices | End of audit |
| Audit adjustments, including uncorrected misstatements | End of audit |
| Disagreements with management | End of audit |
| Difficulties encountered when performing the audit | End of audit |
| Management's consultations with other accountants | End of audit |
| **SEC COMMUNICATIONS (AFTER S-1 IS EFFECTIVE)** | |
| Board of Directors pre-approval of services | Prior to commencing services (when Audit Committee is in place) |
| | |
| | |



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Audit scope and results

## Significant Risks and Critical Accounting Estimates

| AREAS OF FOCUS | PROCEDURES PERFORMED AND RESULTS |
|---|---|
| **Prepaid expenses**<br>**Deferred offering costs**<br>**Accrued expenses**<br>**Related party disclosures**<br>**Sponsor seed equity**<br>**Footnote disclosures**<br>**Subsequent event activity** | Offering costs – those related to the planned public raise were capitalized.<br>• Vouched costs to supporting documentation, engagement letter, use of proceeds table, invoices<br>Accrued expenses<br>• Vouched to supporting invoices.<br>Equity<br>• The equity was traced to subscription agreement and the equity purchase agreed to the payment of certain expenses on behalf of the Company<br>Related Party Transactions<br>• Agreements were obtained to support the Company's related party transactions.<br>Footnote Disclosures<br>• Read through Form S-1 to ensure that management incorporated adequate disclosures<br>Subsequent event activity<br>• Made inquiries of management and financial consultant of whether any activity occurred after the balance sheet date and prior to the issuance of Form S-1 that require consideration or disclosure in the financial statements |



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Audit scope and results

## Related-party Transactions

The Company's related party transactions are described in Note 4 to the financial statements:

- Founder shares – May 26, 2021, Sponsor (Genesis Growth Tech LLC) purchase of 7,187,500 Class B common stock shares (of which 937,500 subject to forfeiture).
- Private placement warrants – the Sponsor has agreed to purchase an aggregate of 7,050,000 Private Placement Warrants (or 7,800,000 if over-allotment option is exercised in full) at a price of $1.00 per Private Placement Warrant.
- Sponsor loan and loans from "Insiders" – the Sponsor agreed to loan the Company an aggregate of up to $500,000 to cover expenses related to the proposed public offering. In addition, from time to time, Insiders (Sponsors, directors or officers) may lend the Company funds as may be required.
- Support services – the Company intends to pay an entity affiliated with the CEO a fee of approximately $10,000 per month following the consummation of the proposed public offering.

# Audit scope and results

## Materiality

Under federal securities laws, a fact is material if there is **"a substantial likelihood that the …fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."**

Essentially, materiality is the magnitude of an omission or misstatement that likely influences a reasonable person's judgment. It is based on a relevant financial statement benchmark.

Financial statement items greater than materiality are in scope. Other areas less than materiality may be in scope if qualitative factors are present (for example, related party relationships or transactions and fraud risk).

# Audit scope and results

## Summary of unrecorded adjustments

**CURRENT PERIOD**: None noted.

.

# Audit scope and results

## Going concern assessment

### NATURE OF EVENTS OR CONDITIONS IDENTIFIED

Management is required to evaluate whether there are conditions or events that raise substantial doubt about the Company's ability to continue as a going concern within one year after the date that the financials statements are issued.

### Procedures / Conclusion

Citrin Cooperman discussed the going concern assessment with management and came to the understanding that the following factors, raise substantial doubt about the Company's ability to continue as a going:

- The Company had no cash and a working capital deficit of approximately $41,519
- The Company has not commenced operations and all activity for the period under audit relates to the Company's formation and the proposed public offering
- The Company will not generate any operating revenues until after the completion of a Business Combination
- The Company cannot assure that its plans to raise capital or to consummate a Business Combination will be successful

Citrin Cooperman has also discussed the uncertainty of the outbreak of COVID-19 on the overall economy and possibly Genesis Growth Tech Acquisition's performance.

# Audit scope and results

## Internal control matters

### Our responsibilities

- Obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control was maintained in all material respects.
- Due to the inherent limitations of an audit, a material weakness may remain undetected.
- Also, the audit is not designed to identify deficiencies in internal control that, individually or in combination, are less severe than a material weakness.
- Control deficiencies that are of a lesser magnitude than a significant deficiency will be communicated to management. We will provide you with a copy of that communication.

### Definitions

- A deficiency in internal control ("control deficiency") exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect, misstatements on a timely basis.
- A material weakness is a deficiency, or a combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the company’s annual or interim financial statements will not be prevented or detected on a timely basis.
- A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting.

**No deficiencies or material weaknesses were identified as a result of our audit procedures.**

# Audit scope and results

## Other required communications

| |
|---|
| **Disagreements with management** |
| Professional standards define a disagreement with management as a matter, whether or not resolved to our satisfaction, concerning a financial accounting, reporting, or auditing matter that could be significant to the financial statements or the auditor's report. We are pleased to report that no disagreements with management arose during the course of our audit. |
| **Management's consultations with other accountants** |
| None |
| **Significant issues discussed with management** |
| None |
| **Difficulties encountered during the audit** |
| No significant difficulties noted. |



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Audit scope and results

## Other required communications (continued)

### Related party relationships and transactions

As part of our audit, we evaluated the Company's identification of, accounting for, and disclosure of the Company's relationships and transactions with related parties as required by professional standards. We noted no related parties or related party relationships or transactions that were previously undisclosed to us; significant related-party transactions that have not been approved in accordance with the Company's policies or procedures or for which exceptions to the Company's policies or procedures were granted; or significant related party transactions that appeared to lack a business purpose.

### Other information in documents containing audited financial statements

- We have read the information in the Form S-1 and consider whether such information, or the manner of its presentation, is not materially inconsistent with the presentation in its financial statements.
- Our responsibility also includes calling to management’s attention any information that we believe is a material misstatement of fact.
- Accordingly, we read such other information and call any noted inaccuracies or inconsistencies to your attention.

# Quality of accounting practices and alternative treatments

We are required to discuss with you the quality, not just the acceptability, of the Company's accounting policies and practices.

In exercising its oversight, we encourage the Board of Directors to:

- Review the Company's selection, application, and disclosure of accounting policies
- Understand the criteria used by management in its selection of these policies and related methods
- Discuss the appropriateness of these policies and related methods with management

# Quality of accounting practices and alternative treatments

## Accounting Policies

We have not taken any significant exceptions with significant accounting policies of the Company.

## Accounting Estimates

Accounting estimates are determined by management based on their review of the current and past operations of the Company and judgment. There is uncertainty associated with all estimates.

- No critical accounting estimates were identified affecting the financial statements.

# Quality of accounting practices and alternative treatments

## Disclosures

There were no significant concerns noted with respect to the Company's disclosures. The disclosures included in the Form S-1 are deemed to have the appropriate clarity, completeness, consistency and neutrality with respect to providing sufficient information for the users of the financial statements.

Disclosure that the warrants qualify for derivative treatment under the guidance of ASC 480 and ASC 815-40.

(We will reconfirm the adequacy of disclosures with management upon our review of the final draft of the Company's Form S-1)

We ask the Company to be mindful of the SEC's Division of Corporation Finance, CF Disclosure Guidance: Topic No. 11, issued December 22, 2020 pertaining to SPAC disclosure considerations.

## Other Related Matters

There were no other matters noted with respect to the quality of accounting practices and alternative treatments.

There were many discussions with management and the working group (counsel and underwriters) on the SEC Statement on Accounting and Reporting Considerations for Warrants Issued by SPAC's.



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Other matters

## Independence

Our firm maintains a robust quality control system supported by comprehensive policies and procedures that enable us to evaluate and maintain our independence. As you exercise your oversight responsibilities, you should understand the more significant aspects of this system, which include:

- Accumulating and communicating relevant information, including a restricted-entity list and use of a tracking system to monitor the financial interests of our personnel.
- Obtaining annual written confirmations of compliance from personnel and member firms
- Monitoring individual compliance, including periodic audits and disciplinary mechanisms
- Evaluating relationships and circumstances that create threats to independence

**We are not aware of any relationships that may bear on our independence.**

# Other matters

## Other material written communications

The following table lists the material written communications between Citrin Cooperman and management or the Board of Directors during the period under audit. Copies are included separately.

| DESCRIPTION | REFERENCE |
|---|---|
| Engagement Letter | Schedule 1 |
| Independence Letter | Schedule 2 |

This communication is intended solely for the information and use of management and those charged with governance of Genesis Growth Tech Acquisition Corp. and is not intended to be and should not be used by anyone other than these specified parties.

CITRINCOOPERMAN®
Accountants and Advisors

May 18, 2021

Mr. Eyal Perez
Genesis Growth Tech Acquisition Corp.

Dear Mr. Perez:

We are pleased to confirm our understanding of the services we are to provide for Genesis Growth Tech Acquisition Corp. (the "Company").

We will audit the financial statements of Genesis Growth Tech Acquisition Corp., which comprise the balance sheet as of [May xx, 2021] ("anticipated balance sheet date"), and the related statement of operations, changes in shareholder's equity and cash flows for the period from inception to [anticipated balance sheet date], and the related notes to the financial statements (the "financial statements").

We will also audit the financial statements as of the closing date upon completion of the securities offering which will be included within and made a part of the Company's report on Form 8-K to be filed with the Securities and Exchange Commission ("SEC"), and issue an opinion on those financial statements.

Based on our audits, we will issue a written report on Genesis Growth Tech Acquisition Corp.'s financial statements, of which is to be included in the Company's registration statement on Form S-1 ("Form S-1") proposed to be filed by SPAC Acquisition Corp. under the Securities Exchange Act of 1933.

This engagement contemplates, when necessary, assistance by us with responding to any letters of comment issued by the SEC with regards to the filing, and any reissuances of the above-mentioned report and consent with subsequent amendments to the registration statement and preparation of a comfort letter addressed to the underwriter.

**Comfort Letter**

In connection with the proposed public offering, we will prepare and deliver to the underwriter to be engaged by the Company a comfort letter prepared in accordance with the provision of PCAOB AS 6101 "Letters for Underwriters and Certain Other Requesting Parties", as adopted by the PCAOB, if we are requested to do so. Delivery of the comfort letter will be conditional upon our receipt of a copy of the related underwriting agreement and an underwriter' representation letter (if required) in a form reasonably acceptable to us. The verification and other procedures we would expect to carry out in connection with the preparation of the comfort letter will be subject to discussion and agreement with the underwriter. Upon the request of the underwriter, we will provide the underwriter with one or more drafts of the comfort letter, which will set out a description of the procedures we would expect to carry out. We will also provide the Company with a copy of the draft comfort letter, and will consider any comments the Company may have with respect to our procedures. The underwriter's acceptance of our signed comfort letter in final form constitutes agreement to the scope and extent of such procedures. In addition, we may be requested to respond to inquiry from the underwriter during a due diligence call or calls. You authorize us to respond to such inquiry. We will discuss our responses with you prior to such calls. An authorized representative from the Company must participate in the due diligence calls.

CITRINCOOPERMAN®
Accountants and Advisors

**Communication with the SEC**

The financial statements and supporting schedules, if required, included in the Company's filings with the SEC are subject to review and comment by the SEC staff and to their interpretation of the applicable rules and regulations. This may involve discussions and communications with the SEC staff, and/or submission of supplemental data in connection with their review. We will inform each other of any such discussion, communication or submission, which may have a bearing on the financial statements, schedules and other financial data in the filings and furnish each other with copies of related written communications.

**Other Services**

We are always available to meet with you and/or other executives at various times throughout the year to discuss current business, operational, accounting and auditing matters affecting your Company. Additional requested services must be pre-approved by the Company's audit committee and must not be a prohibited service pursuant to the rules and interpretations of Sarbanes-Oxley Act. We will also be pleased, at your request, to attend your Board of Directors' and Stockholders' meetings.

**Audit Objective**

The objective of an audit of the financial statements is the expression of an opinion on the financial statements. Accordingly, the objective of our audit is the expression of an opinion about whether Genesis Growth Tech Acquisition Corp.'s financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP").

**Auditor's Responsibilities**

As a public accounting firm registered with the Public Company Accounting Oversight Board ("PCAOB"), we are required to be independent with respect to SPAC Acquisition Corp.in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB. We are responsible for conducting our audit of the financial statements in accordance with the standards established by the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Because our audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is some risk that material misstatements of the financial statements may exist and not be detected by us. Although not absolute assurance, reasonable assurance is a high level of assurance. Also, a financial statement audit is not designed to detect error or fraud that is immaterial to the financial statements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements.

CITRINCOOPERMAN®
Accountants and Advisors

If for any reason we are unable to complete our audit or are unable to form, or have not formed, an opinion, we retain the right to take any course of action permitted by professional standards or regulatory requirements, including declining to express an opinion or issue a report, or withdrawing from the engagement. In that circumstance, we will notify the audit committee and management.

**Audit Procedures**

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, and direct confirmation of certain assets and liabilities by correspondence with selected creditors and financial institutions. We may also request written representations from the Company's attorneys as part of the engagement. At the conclusion of our audit, we will require certain written representations from you about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements. We will plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Company or to acts by management or employees acting on behalf of the Company.

Because of the inherent limitations of an audit, combined with the inherent limitations of internal control, and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us, even though the audit is properly planned and performed in accordance with PCAOB standards. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform the appropriate level of management of any material errors, fraudulent financial reporting, or misappropriation of assets that come to our attention. We will also inform the appropriate level of management of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors.

Our audit of the financial statements will also include reading the other information in the Company's Form S-1 and considering whether other information in the registration statement (including the manner of its presentation) contains a material misstatement of fact or is materially inconsistent with information in the financial statements. However, our audit will not include procedures to corroborate such other information. We are also required to read any document, including the annual report to shareholders and filings with the SEC, that contains or incorporates by reference our audit or interim review reports, or contains any reference to us.

**Auditor's Responsibility to Communicate with Audit Committee and Management**

We will communicate to the audit committee and management of the Company, as appropriate, any errors, fraud, or other illegal acts (unless clearly inconsequential) that come to our attention during our audit. In the case of illegal acts that, in our judgment, would have a material effect on the financial statements, we are also required to follow procedures set forth in the Private Securities Litigation Reform Act of 1995 and in Section 10A of the Securities Exchange Act of 1934, which, under certain circumstances, requires us to communicate

CITRINCOOPERMAN®
Accountants and Advisors

our conclusions to the SEC. While the objective of our audit of the financial statements is not to report on the Company's internal control and we are not obligated to search for material weaknesses or significant deficiencies as part of our audit of the financial statements, we will communicate in writing to the audit committee and management all material weaknesses and significant deficiencies relating to internal control over financial reporting identified while performing our audit. We will also communicate in writing to management all deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies not previously communicated in writing by us or by others, including the Company's internal auditors. We will also inform the audit committee when we have communicated to management all internal control deficiencies. If we conclude that the audit committee's oversight of the Company's external financial reporting and internal control over financial reporting is ineffective, we will communicate that conclusion in writing to the Company's board of directors.

We are also responsible for communicating with the audit committee about certain other matters related to our audit, including (1) our audit responsibility under PCAOB standards; (2) information relating to our independence with respect to the Company; (3) an overview of our overall audit strategy, timing of the audit, and significant risks identified during our risk assessment procedures; (4) management's initial selection of, or changes in, significant accounting policies or the application of such policies, and the effect on the Company's financial statements or disclosures of significant accounting policies in controversial areas or areas for which there is a lack of authoritative guidance or consensus or diversity in practice; (5) the Company's critical accounting policies and practices, including the reasons certain policies and practices are considered critical and how current and anticipated future events might affect the determination of whether certain policies and practices are considered critical; (6) a description of the process management used to develop critical accounting estimates, management's significant assumptions used in critical accounting estimates that have a high degree of subjectivity, and any significant changes management made to the process used to develop critical accounting estimates or management's significant assumptions, including a description of management's reasons for the changes and the effects of the changes on the financial statements; (7) significant transactions outside of the normal course of the Company's business or that otherwise appear to be unusual due to their nature, timing, or size, along with the policies and practices used to account for significant unusual transactions, and our understanding of the business purpose (or lack thereof) of significant unusual transactions; (8) our evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties; (9) our evaluation of the quality of the Company's financial reporting; (10) corrected misstatements arising from our audit and the implications that such corrected misstatements might have on the Company's financial reporting process; (11) uncorrected misstatements aggregated during the current engagement and pertaining to the latest period presented that were determined by management to be immaterial, both individually and in the aggregate; (12) if applicable, our evaluation of the Company's ability to continue as a going concern; (13) difficult or contentious issues about which we consulted with others and that we believe are relevant to the audit committee's oversight of the financial reporting process; (14) disagreements with management about matters, whether or not satisfactorily resolved, that could be significant to the Company's financial statements or our report; (15) any concerns we may have related to significant auditing or accounting matters about which management has consulted with other accountants; (16) any issues discussed with management prior to our retention, including significant discussions regarding the application of accounting principles and auditing standards; (17) any significant difficulties encountered in performing the audit; and (18) other matters required to be communicated by PCAOB standards or that are significant to the oversight of the Company's financial reporting process. Furthermore, we are responsible for providing a copy of the management representation letter to the audit committee if management has not done so, and for communicating to the audit committee other material written communications between the auditor and management.

CITRINCOOPERMAN®
Accountants and Advisors

## Management's Responsibilities

Management is responsible for designing, implementing and maintaining internal controls, relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error, including monitoring ongoing activities; for the selection and application of accounting principles; and for the preparation and fair presentation of the financial statements in conformity with U.S. GAAP. Management is also responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Management is also responsible for providing us with (1) access to all information of which you are aware that is relevant to the preparation and fair presentation of the financial statements, (2) additional information that we may request for the purpose of the audit, and (3) unrestricted access to persons within the Company from whom we determine it necessary to obtain audit evidence.

Management's responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

Management is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the Company involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Management's responsibilities include informing us of their knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, former employees, regulators, or others. In addition, management is responsible for identifying and ensuring that the Company complies with applicable laws and regulations.

Management is also responsible for establishing and maintaining effective internal control over financial reporting, including monitoring activities; notifying us of all deficiencies in the design or operation of internal control over financial reporting of which it has knowledge; and describing to us any fraud resulting in a material misstatement of the financial statements and any other fraud involving senior management or employees who have a significant role in the Company's internal control.

At the conclusion of our audit, you agree to provide us with a letter that confirms certain representations made by management during our audit about the Company's financial statements, internal control over financial reporting, and related matters.

## Engagement Administration, Fees, and Other

We understand that the Company will prepare all cash and other confirmations we request and will locate any documents selected by us for testing.

We may, from time to time and depending on the circumstances, use third-party service providers and vendors' software and systems in serving your account. Third-party service providers include individuals who are not employed by our firm. We may share confidential information about the Company with these service providers and vendors to perform our engagement. We remain committed to maintaining the confidentiality and security of the Company's information. Accordingly, we maintain internal policies, procedures, and safeguards to protect the confidentiality of the Company's personal information. In addition, we will secure confidentiality agreements with all service providers and vendors to maintain the confidentiality of the Company's information and we will take reasonable precautions to determine that they

CITRINCOOPERMAN®
Accountants and Advisors

have appropriate procedures in place to prevent the unauthorized release of the Company's confidential information to others. In the event that we are unable to secure an appropriate confidentiality agreement, you will be asked to provide your consent prior to the sharing of the Company's confidential information with the third-party service provider or vendor. Furthermore, we will remain responsible for the work provided by any such third-party service providers.

During the course of our engagement, Citrin Cooperman & Company, LLP ("Citrin Cooperman") or the Company may need to electronically transmit confidential information to each other and to other entities engaged by either party. E-mail is a fast and convenient way to communicate. However, e-mail is not a secure means of communication and thus, confidentiality could be compromised. The Company agrees to the use of e-mail and other electronic methods to transmit and receive information between Citrin Cooperman and the Company and between Citrin Cooperman and third-party service providers or other entities engaged by Citrin Cooperman or the Company.

The audit documentation for this engagement is the property of our firm and constitutes confidential information. However, we may be requested to make certain audit documentation available to the SEC, or other regulators pursuant to the authority given to them by law or regulation. If requested, access to such audit documentation will be provided under the supervision of firm personnel. Further, upon request, we may provide copies of selected audit documentation to the regulator. The regulator may intend, or decide, to distribute the copies or information contained therein to others, including other government agencies. We agree to communicate with you on a timely basis any requests by the regulators for access to audit documentation as part of its inspection process and when it desires direct contact with members of the audit committee.

The Company may wish to include or incorporate by reference our audit report on these financial statements in other documents, such as another registration statement proposed to be filed under the Securities Act of 1933 or in some other securities offering. If so, you agree not to include our audit report or make reference to our firm without our prior permission or consent.

The audit documentation for this engagement is the property of our firm and constitutes confidential information. However, we may be requested to make certain audit documentation available to the SEC, or other regulators pursuant to the authority given to them by law or regulation. If requested, access to such audit documentation will be provided under the supervision of firm personnel. Further, upon request, we may provide copies of selected audit documentation to the regulator. The regulator may intend, or decide, to distribute the copies or information contained therein to others, including other government agencies. We agree to communicate with you on a timely basis any requests by the regulators for access to audit documentation as part of its inspection process and when it desires direct contact with members of the audit committee.

Citrin Cooperman is not a host for any client information. The Company is expected to retain all financial and non-financial information including anything the Company's employees upload to a portal and management is responsible for downloading and retaining anything we upload in a timely manner. Portals are only meant as a method of transferring data, are not intended for the storage of client information, and may be deleted at any time.

CITRINCOOPERMAN®
Accountants and Advisors

Except with respect to a dispute or litigation between Citrin Cooperman & Company, LLP and Genesis Growth Tech Acquisition Corp., our attorney fees, costs and time spent in legal and regulatory matters or proceedings arising from our engagement, such as subpoenas, testimony, or consultation involving private litigation, arbitration, industry, or government regulatory inquiries, whether made at Genesis Growth Tech Acquisition Corp.'s request or by subpoena, will be billed to the Company separately.

Joseph J. Puglisi or Chris Brown will be the engagement partner and is responsible for supervising the engagement and signing the report or authorizing another individual to sign it. We expect to begin our audit on approximately May 31, 2021.

Our firm has offices in several states located throughout the United States and a wholly-owned and controlled offshore affiliate. Work on the engagement may be performed in any of our locations based on our scheduling needs and availability.

To ensure that Citrin Cooperman's independence is not impaired, you agree to inform the engagement partner before entering into any substantive employment discussions with any of our personnel. When we lose a valued member of our engagement team, we not only incur significant expenses in hiring and training replacement personnel, but employment by SPAC Acquisition Corp.raises serious independence threats, which could cause us to terminate our engagement. We are not deemed independent if an engagement team member joins the Company in a financial reporting oversight role during the engagement period and through Genesis Growth Tech Acquisition Corp.'s subsequent year's annual regulatory filing ("one-year cooling off period").

During the term of this engagement and through the one-year cooling off period, the Company agrees not to solicit, directly or indirectly, or hire any of our personnel participating in the engagement without our express written consent unless it is pursuant to a general solicitation of employment not aimed at Citrin Cooperman's personnel.

Our fees for these services are estimated to be approximately $15,000 for Phase one ("seed audit, SEC comments and consents) and approximately $19,000 for Phase two (consents, comfort letter, bring down letter and 8-K audit(s)). Where:

Phase one includes: Seed audit; assistance to management relative to SEC comments; consents for filing our opinion in subsequent amendments (note: each consent will require abbreviated audit update procedures; comfort letter to underwriter prior to going effective; and bring down letter to underwriters prior to deal closing.

Phase two includes: Closing date audit; over-allotment audit, if applicable; bring down letter.

The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the engagement. If significant additional time is necessary, we will discuss it with you and arrive at a new fee estimate. Our invoices for these fees will be rendered each month as work progresses and are payable on presentation.

Our fee estimate for our services above does not contemplate any potential additional time required to apply any further procedures necessary as a result of changes in the Company's operations, policies, procedures or internal controls due to the COVID-19 pandemic. Billings for any such additional time will be based upon the amount of time required to complete the necessary procedures at our standard billing rates for the personnel involved. Our invoices for any such additional work will be rendered as the work progresses and are payable upon presentation.

In accordance with our firm policies, work may be suspended if the Company's account becomes overdue

CITRINCOOPERMAN®
Accountants and Advisors

and will not be resumed until the Company's account is paid in full. You acknowledge and agree that we are not required to continue work in the event of the Company's failure to pay any statement or invoice from us in accordance with our customary invoice terms. Should work be suspended, Citrin Cooperman shall not be liable to the Company for any damages that occur as a result of our ceasing to render services. In the event that a situation arises that precludes us from completing the engagement, the Company agrees to pay us for the time we incurred on this engagement at our standard hourly rates. The Company agrees to reimburse Citrin Cooperman for attorneys' fees and costs incurred in connection with the collection of past due fees.

Any dispute arising out of or relating to this engagement, or breach thereof, shall first be submitted for good faith mediation administered by the American Arbitration Association ("AAA") under Accounting and Related Services Arbitration Rules and Mediation Procedures (the "Rules"). The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties. Mediation shall take place at a place to be designated by the parties in New York, New York. No litigation, arbitration or other proceeding shall be commenced prior to sixty (60) days after the parties' first appearance before the mediator.

If the matter is not resolved by mediation within sixty (60) days of its submission to the mediator, then the parties shall submit the dispute for arbitration administered by the AAA under the Rules.

The arbitration will be conducted before a single arbitrator selected from the AAA's Panel of Accounting Professionals and Attorneys and shall take place at a place to be designated by the parties. The arbitrator shall be a fit and impartial person and shall have at least ten (10) years' experience in commercial litigation, accounting or a similar field connected to the subject matter of the dispute. The arbitrator, with the aforementioned requisite qualifications, shall be selected pursuant to the Rules.

The arbitrator shall issue his or her final award in a written and reasoned decision to be provided to each party. In his or her decision, the arbitrator will declare one party the prevailing party.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitrator may disclose the existence, content or result of the arbitration only as expressly provided by the Rules.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.

This agreement, its enforcement and any dispute relating in any way to this engagement will be governed by the laws of the State of New York, without giving effect to any provisions relating to conflict of laws that would require the laws of another jurisdiction to apply.

This agreement represents the entire understanding between the Company and Citrin Cooperman with respect to this engagement. Any amendments to this agreement must be in writing and signed by an authorized representative of both parties.

Our acceptance of this engagement is subject to our normal client intake and due diligence procedures. We anticipate that this will be completed within five business days of your countersigning this letter and will advise you when complete.

CITRINCOOPERMAN®
Accountants and Advisors

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

Very truly yours,

Citrin Cooperman & Company, LLP

CITRIN COOPERMAN & COMPANY, LLP

CLIENT AGREEMENT AND ACCEPTANCE
Agreed and accepted by:

Mr. Eyal Perez:

18. 05. 2021
Date

CITRINCOOPERMAN®
Accountants and Advisors

May 18, 2021

Mr. Eyal Perez

Genesis Growth Tech Acquisition Corp.

PCAOB Rule 3526, *Communication with Audit Committees Concerning Independence*, requires that, prior to accepting an engagement to be your company's auditor, we disclose to you in writing all relationships between our firm and any affiliates and your company and its related entities or persons in financial reporting oversight roles at your company that may reasonably be thought to bear on independence.

We are not aware of any such relationships.

We confirm that we are independent of the Company in compliance with Rule 3520 and within the meaning of the federal securities laws administered by the Securities and Exchange Commission.

As further required by PCAOB Rule 3526, we will be pleased to discuss the potential effects of such relationships on our independence with respect to the Company at your convenience.

This letter is intended solely for use by you and other members of the Board of Directors in your consideration of our independence as auditors and should not be used for any other purpose.

Very truly yours,

Citrin Cooperman & Company, LLP

# EXHIBIT D


CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS
PRESENTATION
to the Board of Directors of
Genesis Growth Tech Acquisition Corp.
Audit Results for the Financial statements
As of December 31, 2021 and for the period from March 17, 2021 (inception) thought December 31, 2021
Communicated April 12, 2022

# Citrin Cooperman Engagement Team

## Audit Team

- Christopher Brown, Engagement Partner
- Annette Tolentino, Audit Director (Engagement In-Charge)
- Mitul Doshi, Audit Manager
- Barbara Stofflet, Partner and Engagement Quality Reviewer



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Our responsibilities

The responsibilities of those Charged with Governance (Audit Committee), Management and Citrin Cooperman were previously communicated in our engagement letter dated February 15, 2022. Other forms of communication during planning and risk assessment includes:

- PCAOB 3526 Independence Letter
- Audit Planning Communication Letter
- Audit Planning Presentation

**<u>Certain audit procedures are pending completion:</u>**

- Review of subsequent events up to the date of financial statements issuance
- Legal updates in connection with our audit inquiry letter
- Inquires and comments on updated Form 10k draft report
- Engagement Quality Review in progress
- Signed management representation letter

# Our responsibilities

## Required communications

| | WHEN DELIVERED |
|---|---|
| **PCAOB COMMUNICATIONS** | |
| Independence and retention matters | Prior to our retention and annually, thereafter |
| Our responsibilities under PCAOB standards | Prior to commencing services |
| Fraud and illegal acts | When event becomes known |
| Material weaknesses and significant deficiencies | Prior to report issuance |
| Other internal control deficiencies | End of audit |
| Significant accounting policies, judgments, and estimates | End of audit |
| Our judgments about the quality of accounting practices | End of audit |
| Audit adjustments, including uncorrected misstatements | End of audit |
| Disagreements with management | End of audit |
| Difficulties encountered when performing the audit | End of audit |
| Management's consultations with other accountants | End of audit |
| **SEC COMMUNICATIONS** | |
| Audit Committee pre-approval of services | Prior to commencing services |
| Critical accounting policies and practices, and alternative treatments | Prior to filing |
| Material written communications with management | Prior to filing |



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Audit scope and results

## Significant Risks

| AREAS OF FOCUS | PROCEDURES PERFORMED AND RESULTS |
|---|---|
| Equity | • With respect to the Class B common stock issued to founders, traced and agreed the funds received to the bank statement and evaluated appropriate classification as permanent equity<br>• With respect to the Initial Public Offering (IPO), vouched proceeds from the flow of funds to the bank statement and vouched issuance costs to underlying supporting documentation including a review of issuance costs capitalized as deferred offering costs to ensure these costs were appropriately charged to equity.<br>• Evaluated the accounting treatment and amount recorded for the redeemable Class A shares to ensure appropriate classification as temporary equity.<br>• Evaluated the accounting for public  and private warrants (“Warrants”) and their classification (equity vs liability treatment). The Warrants issued pursuant to the warrant agreement qualify for equity accounting treatment.<br>• Confirmation from Continental Stock Transfer to confirm the number of shares of Common Stock issued and outstanding at December 31, 2021.<br>• Recalculated the net loss per ordinary share |



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Audit scope and results

## Significant Risks and Critical Accounting Estimates

| AREAS OF FOCUS | PROCEDURES PERFORMED AND RESULTS |
|---|---|
| Money market fund held in Trust Account | The Trust Account balance was confirmed directly with the financial institution. |
| Prepaid expenses | Prepayment of D&O insurance was supported to insurance policy and supporting invoices. The prepaid as of year-end was recomputed. An audit adjustment was proposed to management. |
| Accounts Payable | Vouched to supporting invoices. An audit adjustment was proposed to management. |
| Deferred underwriting commissions | Reviewed underwriting agreement and recalculated amounts recorded as deferred underwriting fees and those paid upon consummation of the IPO; traced and agreed amount paid to the flow of funds and bank statement. |
| Related Party Transactions | Agreements were obtained to support the Company's related party transactions. |
| Footnote Disclosures | Footnote Disclosures - Read through Form 10-K to ensure that management incorporated adequate disclosures |
| Subsequent Events | Subsequent event activity -Made inquiries of management and financial consultant of whether any activity occurred after the balance sheet date and prior to the issuance of Form 10-K that require consideration or disclosure in the financial statements. This procedure is performed up to the date of the audit report date. |
| | |



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Audit scope and results

## Significant Risks

| AREAS OF FOCUS | PROCEDURES PERFORMED AND RESULTS |
|---|---|
| Financial Reporting | **Liquidity and Capital Resources:**<br>In the notes to the financial statements, the Company discloses that it has re-evaluated the liquidity and financial condition and concluded that substantial doubt has been alleviated as the Company can sustain operations for at least one year from the date that the financial statements are to be issued.<br>Citrin Cooperman discussed and reviewed supporting documentation regarding the going concern assessment conducted by management and came to the understanding that, there wad no longer substantial doubt about the Company's ability to continue as a going concern.<br>Citrin is reviewing management's disclosure to the notes to the financial statements. |



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Audit scope and results

## Related-Party Transactions

The Company's related party transactions are described in Note 4 to the financial statements:

- **Founder shares** – On May 26, 2021, Sponsor (Genesis Growth Tech LLC) purchased of 7,187,500 Class B common stock shares. On September 20, 2021, the Sponsor surrendered 1,437,500 Class B common shares, resulting in the Sponsor holding an aggregate of 5,750,000 Class B common shares at November 19, 2021, of which 750,000 are subject for forfeit. On December 8, 2021, the Company effected a share capitalization pursuant to which the Company issued an additional 575,000 Founder Shares to the Sponsor, resulting in the Sponsor holding an aggregate of 6,325,000 Founder Shares. On December 21, 2021, the Sponsor transferred to Nomura Securities International, Inc. ("Nomura"), the underwriter of the Initial Public Offering, an aggregate of 474,375 Founder Shares at the Sponsor's original purchase price of $1,500, subject to forfeiture by Nomura if the Initial Public Offering is terminated or if Nomura is not the underwriter of the Initial Public Offering. As a result, the Sponsor holds 5,850,625 Founder Shares and Nomura holds 474,375 Founder Shares. Up to 825,000 Founder Shares were subject to forfeiture to the extent that the over-allotment option is not exercised in full by the underwriter, so that the Founder Shares will represent 20.0% of the Company's issued and out-standing shares after the Initial Public Offering. On December 21, 2021, the underwriters fully exercised the over-allotment option to purchase an additional 3,300,000 Units. As a result, the 825,000 Founder Shares were no longer subject to forfeiture.

- **Private placement warrants** – the Sponsor purchased Private Placement of 8,050,000 Private Placement Warrants, at a price of $1.00 per Private Placement Warrant, generating proceeds of approximately $8.1 million. In connection with the full exercise of the over-allotment option on December 21, 2021, the Sponsor purchased an additional 825,000 Private Placement Warrants at a purchase price of $1.00 per Private Placement Warrant, generating additional gross proceeds to the Company of $825,000

# Audit scope and results

## Related-Party Transactions

The Company's related party transactions are described in Note 4 to the financial statements:

- **Sponsor loan and loans from "Insiders"** – the Sponsor agreed to loan the Company an aggregate of up to $500,000 to cover expenses related to the proposed public offering. As of December 31, 2021, the Company borrowed approximately $453,000 under the Note. $200,000 was paid after the IPO and prior to year end and $25,000 of amount owed in connection with the private placement was offset against amount due to the Sponsor, resulting in approximately $228,000 due as of year end. In March 2022, the Note was repaid. From time to time, Insiders (Sponsors, directors or officers) may lend the Company funds as may be required.

- **Support services –** On December 8, 2021, the Company entered into an agreement with the Sponsor, pursuant to which the Company agreed to reimburse the Sponsor or an affiliate of the Sponsor for office space, secretarial and administrative services provided to the Company in the amount of $10,000 per month through the earlier of the consummation of the initial Business Combination and the Company's liquidation.

# Audit scope and results

## Materiality

Under federal securities laws, a fact is material if there is **"a substantial likelihood that the …fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."**

Essentially, materiality is the magnitude of an omission or misstatement that likely influences a reasonable person's judgment. It is also based on a relevant financial statement benchmark.

**We believe that total equity (excluding redeemable equity) is the appropriate benchmark for the Company**

Financial statement items greater than materiality are in scope. Other areas less than materiality may be in scope if qualitative factors are present (for example, related party relationships or transactions and fraud risk).

# Audit scope and results

Summary of recorded adjustments: **CURRENT PERIOD**: None noted

Summary of unrecorded adjustments: **CURRENT PERIOD**:

- The Company overstated the prepaid expense related to D&O insurance and accounts payable by approximately $19,000.
- The Company understated the accrued expenses and legal expense by approximately $38,000 related to fees incurred by Orrick.
- A reclassification entry was recorded to allocate the offering cost associated with the issuance of warrants as part of the Units in the IPO to the accretion for redeemable shares subject to redemption value for approximately $19,000.

# Audit scope and results

## Going concern assessment

| NATURE OF EVENTS OR CONDITIONS IDENTIFIED |
| --- |
| Management is required to evaluate whether there are conditions or events that raise substantial doubt about the Company's ability to continue as a going concern within one year after the date that the financials statements are issued. Prior to the initial public offering, the Company's liquidity needs were satisfied by the Sponsor through the purchase of Class B common stock and issuance of promissory notes. The Company's liquidity needs have been satisfied through the net proceeds from the consummation of the initial public offering and private placement. Accordingly, management believes that the Company will have sufficient working capital and borrowing capacity to meet its liquidity needs through the earlier of the consummation of a Business Combination or one year from the date of this filing. |
| **Procedures / Conclusion** |
| Citrin Cooperman's audit report is not yet complete, and we are still in the process of evaluating management's assessment of going concern. The financial statements as of December 31, 2021, and for the period from March 17, 2021 (inception) to December 31, 2021, includes a liquidity footnote as noted previously.<br><br>Citrin Cooperman has also discussed the uncertainty of the outbreak of COVID-19 and associated with the economic sanctions imposed on the Russian Federation and their impact on the overall economy and possibly impact on the Company's performance. |

# Audit scope and results

## Internal control matters

### Our responsibilities

- Obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control was maintained in all material respects.
- Due to the inherent limitations of an audit, a material weakness may remain undetected.
- Also, the audit is not designed to identify deficiencies in internal control that, individually or in combination, are less severe than a material weakness.
- Control deficiencies that are of a lesser magnitude than a significant deficiency will be communicated to management. We will provide you with a copy of that communication.

### Definitions

- A deficiency in internal control ("control deficiency") exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect, misstatements on a timely basis.
- A material weakness is a deficiency, or a combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.
- A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting.

**No material weaknesses were identified as a result of our audit procedures. Citrin will communicate if any significant deficiencies or control deficiencies are identified after all reviews are completed.**

# Audit scope and results

## Other required communications

| |
|---|
| **Disagreements with management** |
| Professional standards define a disagreement with management as a matter, whether or not resolved to our satisfaction, concerning a financial accounting, reporting, or auditing matter that could be significant to the financial statements or the auditor's report. We are pleased to report that no disagreements with management arose during the course of our audit. |
| **Management's consultations with other accountants** |
| None |
| **Significant issues discussed with management** |
| None |
| **Difficulties encountered during the audit** |
| No significant difficulties noted. |



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Audit scope and results

## Other required communications (continued)

### Related party relationships and transactions

As part of our audit, we evaluated the Company's identification of, accounting for, and disclosure of the Company's relationships and transactions with related parties as required by professional standards. We noted no related parties or related party relationships or transactions that were previously undisclosed to us; significant related-party transactions that have not been approved in accordance with the Company's policies or procedures or for which exceptions to the Company's policies or procedures were granted; or significant related party transactions that appeared to lack a business purpose.

### Other information in documents containing audited financial statements

- We have read the information in the Form 10-K and consider whether such information, or the manner of its presentation, is not materially inconsistent with the presentation in its financial statements.
- Our responsibility also includes calling to management's attention any information that we believe is a material misstatement of fact.
- Accordingly, we read such other information and call any noted inaccuracies or inconsistencies to your attention.



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Quality of accounting practices and alternative treatments

We are required to discuss with you the quality, not just the acceptability, of the Company's accounting policies and practices. In accordance with SEC rules and regulations, we are also required to discuss critical accounting policies and practices, as well as alternative treatments.

Critical accounting policies and practices are those that are most important to financial condition and results. They require management's most subjective, difficult, or complex judgments and often involve critical estimates. Critical estimates often require assumptions about matters that are highly uncertain.

In exercising its oversight, we encourage the Board of Directors to:

- Review the Company's selection, application, and disclosure of accounting policies
- Understand the criteria used by management in its selection of these policies and related methods
- Discuss the appropriateness of these policies and related methods with management

# Quality of accounting practices and alternative treatments

## Accounting Policies

We have not taken any significant exceptions with significant accounting policies of the Company.

## Accounting Estimates

Accounting estimates are determined by management based on their review of the current and past operations of the Company and judgment. There is uncertainty associated with all estimates. Material estimates based on management's judgment include:

- Valuation of public and private warrants
- Valuation of the Class B shares on the IPO date (December 13, 2021) transferred to the underwriter

# Quality of accounting practices and alternative treatments

## Disclosures

There were no significant concerns noted with respect to the Company's disclosures. The disclosures included in the Form 10-K are deemed to have the appropriate clarity, completeness, consistency and neutrality with respect to providing sufficient information for the users of the financial statements.

- Disclosure that the Class A common stock is classified as temporary equity under the guidance of ASC 480.
- Disclosure that the Public and Private Warrants will be included in equity under the guidance of ASC 815.

We ask the Company to be mindful of the SEC's Division of Corporation Finance, CF Disclosure Guidance: Topic No. 11, issued December 22, 2020 pertaining to SPAC disclosure considerations.

## Other Related Matters

There were no other matters noted with respect to the quality of accounting practices and alternative treatments.

There were many discussions with management and the working group (counsel and underwriters) on the SEC Statement on Accounting and Reporting Considerations for Warrants Issued by SPAC's.



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Other matters

## Independence

Our firm maintains a robust quality control system supported by comprehensive policies and procedures that enable us to evaluate and maintain our independence. As you exercise your oversight responsibilities, you should understand the more significant aspects of this system, which include:

- Accumulating and communicating relevant information, including a restricted-entity list and use of a tracking system to monitor the financial interests of our personnel.
- Obtaining annual written confirmations of compliance from personnel and member firms
- Monitoring individual compliance, including periodic audits and disciplinary mechanisms
- Evaluating relationships and circumstances that create threats to independence

**We are not aware of any relationships that may bear on our independence.**



CITRINCOOPERMAN®
FOCUS ON WHAT COUNTS

# Other matters

## Other material written communications

The following table lists the material written communications between Citrin Cooperman and management or the Board of Directors during the period under audit. Copies are included separately.

| DESCRIPTION | REFERENCE |
|---|---|
| Engagement Letter | Previously provided |
| Independence Letter | Previously provided |
| Representation letter | To be provided upon completion of all audit procedures |

This communication is intended solely for the information and use of management and those charged with governance of Genesis Growth Tech Acquisition Corp. and is not intended to be and should not be used by anyone other than these specified parties.

# EXHIBIT E

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): **May 15, 2023**

**GENESIS GROWTH TECH ACQUISITION CORP.**
(Exact name of registrant as specified in its charter)

| **Cayman Islands** | **001-41138** | **98-1601264** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| **Bahnhofstrasse 3 Hergiswil Nidwalden, Switzerland** | **6052** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: **+41 78 607 99 01**

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Units, each consisting of one Class A Ordinary Share, $0.0001 par value, and one-half of one redeemable warrant | GGAAU | The Nasdaq Stock Market LLC |
| Class A Ordinary Shares included as part of the units | GGAA | The Nasdaq Stock Market LLC |
| Redeemable warrants included as part of the units, each whole warrant exercisable for one Class A Ordinary Share at an exercise price of $11.50 | GGAAW | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 or Rule 12b-2 of the Securities Exchange Act of 1934.

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

(b) By letter dated May 15, 2023, Citrin Cooperman & Company, LLP ("**Citrin**"), our former independent registered public accounting firm, advised the Audit Committee Chair and the Chief Executive Officer of Genesis Growth Tech Acquisition Corp. (the "**Company**"), that for the reasons set forth below, Citrin could not continue to be associated with the following financial statements of the Company (collectively, the "**Impacted Financial Statements**"):

(i) the audited financial statements of the Company as of December 31, 2021 and for the period from March 17, 2021 (inception) through December 31, 2021, on which Citrin issued a report dated April 15, 2022; and

(ii) the unaudited condensed financial statements contained in the Company's Quarterly Reports on Form 10-Q for the periods ended March 31, 2022, June 30, 2022 and September 30, 2022.

Citrin advised that the Impacted Financial Statements each included a line item entitled "Cash."

Citrin stated that on May 12, 2023, it was notified by the Company's Chief Executive Officer, Eyal Perez, that this cash account is not an asset of the Company. Specifically, Mr. Perez indicated to Citrin that this cash account, which is an operating bank account in Geneva, Switzerland, is not owned by the Company and was not owned by the Company during any of the periods covered by the Impacted Financial Statements. Based on the information provided by Mr. Perez, Citrin stated its belief that the Impacted Financial Statements may be incorrect, and the impact of this error may be material to the Impacted Financial Statements.

The letter from Citrin noted that during its audit and interim review procedures, Mr. Perez represented, among other things, that the cash account was owned by the Company. As a result of Mr. Perez's communication of May 12, 2023 to the contrary, Citrin determined that the audit evidence obtained from the Company to perform the audit and interim review procedures over the Company's cash account was not reliable. Citrin further stated that given the discovery of this new information and possible misstatements in the Impacted Financial Statements, it had concerns about the integrity of management including but not limited to their previously provided management representations.

As a result, Citrin advised that it could not continue to be associated with the Impacted Financial Statements and was withdrawing its reports dated April 15, 2022, and September 23, 2022. Moreover, Citrin advised the Company that it had concluded that the Impacted Financial Statements should no longer be relied upon and that the appropriate actions should be taken to prevent further reliance on the Impacted Financial Statements, including disclosure in a Current Report on Form 8-K pursuant to Item 4.02(b) of that form.

The Company is making that disclosure herewith and in a Current Report on Form 8-K filed on May 23, 2023, setting forth the steps it is taking to correct and remediate the error.

Neither the Company's Audit Committee Chair nor its Board of Directors has discussed the matters disclosed in this filing with Citrin.

The Company provided Citrin with the disclosures under this Item 4.02(b) and requested Citrin to furnish the Company with a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements made by the Company in this Item 4.02(b) and, if not, stating the respects in which it does not agree. Upon receipt, Citrin's letter will be filed as Exhibit 16.1 by an amendment to this report on Form 8-K/A.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 99.1 | Letter from Citrin Cooperman & Company, LLP (to be filed by amendment) |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**GENESIS GROWTH TECH ACQUISITION CORP.**

Date: May 24, 2023

By: /s/ Eyal Perez
Name: Eyal Perez
Title: Chief Executive Officer,
Chief Financial Officer and Director

# EXHIBIT F

CITRINCOOPERMAN®

Citrin Cooperman & Company, LLP
Certified Public Accountants

50 Rockefeller Plaza
New York, NY 10020
**T** 212.697.1000 **F** 212.697.1004
citrincooperman.com

Mr. Cem Habib, Audit Committee Chair
Eyal Perez, Chief Executive Officer
Genesis Growth Tech Acquisition Corp.
Bahnhofstrasse 3, 6052 Hergiswil
ONidwalden, Switzerland

Dear Mr. Cem Habib and Mr. Eyal Perez:

We are pleased to confirm our understanding of the services we are to provide for Genesis Growth Tech Acquisition Corp. (the "Company") for the year ended December 31, 2022.

We will audit the financial statements of Genesis Growth Tech Acquisition Corp., which comprise the balance sheet as of December 31, 2022, and the related statements of operations, changes in shareholders' equity and cash flows for the year then ended, and the related notes to the financial statements (the "financial statements").

Based on our audit, we will issue a written report on Genesis Growth Tech Acquisition Corp.'s financial statements, and schedules supporting such financial statements, all of which are to be included in the annual report ("Form 10-K") proposed to be filed by Genesis Growth Tech Acquisition Corp. under the Securities Exchange Act of 1934.

**Audit Objective**

The objective of an audit of the financial statements is the expression of an opinion on the financial statements. Accordingly, the objective of our audit is the expression of an opinion about whether Genesis Growth Tech Acquisition Corp.'s financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP").

**Auditor's Responsibilities**

As a public accounting firm registered with the Public Company Accounting Oversight Board ("PCAOB"), we are required to be independent with respect to Genesis Growth Tech Acquisition Corp. in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB. We are responsible for conducting our audit of the financial statements in accordance with the standards established by the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Because our audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is some risk that material misstatements of the financial statements may exist and not be detected by us. Although not absolute assurance, reasonable assurance is a high level of assurance. Also, a financial statement audit is not designed to detect error or fraud that is immaterial to the financial statements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements.

CITRINCOOPERMAN®

Citrin Cooperman & Company, LLP



We will provide to and discuss with management and the audit committee a draft of the auditor's report. If for any reason we are unable to complete our audit or are unable to form, or have not formed, an opinion, we retain the right to take any course of action permitted by professional standards or regulatory requirements, including declining to express an opinion or issue a report, or withdrawing from the engagement. In that circumstance, we will notify the audit committee and management.

**Audit Procedures**

Our audit of the financial statements will include performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures to respond to those risks. Our audit will include tests of documentary evidence supporting the transactions recorded in the accounts, including tests of the physical existence of inventories and direct confirmation of certain assets and liabilities by correspondence with selected customers, creditors, and financial institutions. The audit will include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. An audit also includes evaluating the appropriateness of accounting principles used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements. In connection with our audit of the financial statements, we will obtain an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed; however, an audit of the financial statements is not designed to provide assurance on internal control or to identify internal control deficiencies.

Our audit of the financial statements will also include reading the other information in the Company's annual report and considering whether other information in the annual report (including the manner of its presentation) contains a material misstatement of fact or is materially inconsistent with information in the financial statements. However, our audit will not include procedures to corroborate such other information. We are also required to read any document, including the annual report to shareholders and filings with the SEC, that contains or incorporates by reference our audit or interim review reports, or contains any reference to us.

**Review of Unaudited Quarterly Financial Information**

In conjunction with the annual audit, we will also perform reviews of the Company's unaudited quarterly financial information for each of the four quarters and the year-to-date periods in the year ending December 31, 2023, which are to be included in the quarterly reports ("Form 10-Q") proposed to be filed by Genesis Growth Tech Acquisition Corp. under the Securities Exchange Act of 1934. We will also review selected quarterly financial data specified by Item 302 of Regulation S-K, which is required to be included in the annual report ("Form 10-K") proposed to be filed by Genesis Growth Tech Acquisition Corp. under the Securities Exchange Act of 1934. For the first three quarters, we will perform reviews of that information before the Form 10-Q is filed. These reviews will be conducted in accordance with the standards of the PCAOB. The objective of a review of interim financial information is to provide a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform

Citrin Cooperman & Company, LLP

CITRINCOOPERMAN®



with U.S. GAAP. A review is substantially less in scope than an audit conducted in accordance with PCAOB standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we will not express an opinion on the Company's interim financial information.

A review of interim financial information consists principally of performing analytical procedures applied to financial data and making inquiries of persons responsible for financial and accounting matters. It includes obtaining sufficient knowledge of the Company's business and its internal control as it relates to the preparation of both annual and interim financial information (1) to identify the types of potential material misstatements in the interim financial information and consider the likelihood of their potential occurrence, and (2) to select the inquiries and analytical procedures that will provide a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with U.S. GAAP.

A review does not contemplate tests of accounting records or internal controls, tests of responses to inquiries by obtaining corroborating evidence, or performing certain other procedures ordinarily performed in an audit. Thus, a review does not provide assurance that we will become aware of all significant matters that would be identified in an audit and cannot be relied on to detect errors, fraud, or illegal acts. Furthermore, given the limited nature of review procedures, we may not become aware of all matters that might affect judgments about qualitative aspects of the Company's accounting policies and procedures. Also, a review is not designed to provide assurance on internal control or to identify material weaknesses or significant deficiencies in internal control.

As agreed, we will not issue a written report on our review of the Company's interim financial information. However, if the Company refers to the interim financial information that we have reviewed when such information is included in documents issued to shareholders or third parties, including the SEC, we are required by professional standards to issue a written report on our review, which much accompany the interim financial information in the document.

If, for any reason, we are unable to complete our reviews or are unable to obtain or have not obtained limited assurance on the interim financial information, we will communicate the circumstances to the audit committee and management.

**Auditor's Responsibility to Communicate with Audit Committee and Management**

We will communicate to the audit committee and management of the Company, as appropriate, any errors, fraud, or other illegal acts (unless clearly inconsequential) that come to our attention during our audit. In the case of illegal acts that, in our judgment, would have a material effect on the financial statements, we are also required to follow procedures set forth in the Private Securities Litigation Reform Act of 1995 and in Section 10A of the Securities Exchange Act of 1934, which, under certain circumstances, requires us to communicate our conclusions to the SEC. While the objective of our audit of the financial statements is not to report on the Company's internal control and we are not obligated to search for material weaknesses or significant deficiencies as part of our audit of the financial statements, we will communicate in writing to the audit committee and management all material weaknesses and significant deficiencies relating to internal control over financial reporting identified while performing our audit. We will also communicate in writing to management all

CITRINCOOPERMAN®

Citrin Cooperman & Company, LLP



deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies not previously communicated in writing by us or by others, including the Company's internal auditors. We will also inform the audit committee when we have communicated to management all internal control deficiencies. If we conclude that the audit committee's oversight of the Company's external financial reporting and internal control over financial reporting is ineffective, we will communicate that conclusion in writing to the Company's board of directors.

We are also responsible for communicating with the audit committee about certain other matters related to our audit, including (1) our audit responsibility under PCAOB standards; (2) information relating to our independence with respect to the Company; (3) an overview of our overall audit strategy, timing of the audit, and significant risks identified during our risk assessment procedures; (4) management's initial selection of, or changes in, significant accounting policies or the application of such policies, and the effect on the Company's financial statements or disclosures of significant accounting policies in controversial areas or areas for which there is a lack of authoritative guidance or consensus or diversity in practice; (5) the Company's critical accounting policies and practices, including the reasons certain policies and practices are considered critical and how current and anticipated future events might affect the determination of whether certain policies and practices are considered critical; (6) a description of the process management used to develop critical accounting estimates, management's significant assumptions used in critical accounting estimates that have a high degree of subjectivity, and any significant changes management made to the process used to develop critical accounting estimates or management's significant assumptions, including a description of management's reasons for the changes and the effects of the changes on the financial statements; (7) significant transactions outside of the normal course of the Company's business or that otherwise appear to be unusual due to their nature, timing, or size, along with the policies and practices used to account for significant unusual transactions, and our understanding of the business purpose (or lack thereof) of significant unusual transactions; (8) our evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties; (9) our evaluation of the quality of the Company's financial reporting; (10) corrected misstatements arising from our audit and the implications that such corrected misstatements might have on the Company's financial reporting process; (11) uncorrected misstatements aggregated during the current engagement and pertaining to the latest period presented that were determined by management to be immaterial, both individually and in the aggregate; (12) if applicable, our evaluation of the Company's ability to continue as a going concern; (13) difficult or contentious issues about which we consulted with others and that we believe are relevant to the audit committee's oversight of the financial reporting process; (14) disagreements with management about matters, whether or not satisfactorily resolved, that could be significant to the Company's financial statements or our report; (15) any concerns we may have related to significant auditing or accounting matters about which management has consulted with other accountants; (16) any issues discussed with management prior to our retention, including significant discussions regarding the application of accounting principles and auditing standards; (17) any significant difficulties encountered in performing the audit; and (18) other matters required to be communicated by PCAOB standards or that are significant to the oversight of the Company's financial reporting process. Furthermore, we are responsible for providing a copy of the management representation letter to the audit committee if management has not done so, and for communicating to the audit committee other material written communications between the auditor and management.

CITRINCOOPERMAN

Citrin Cooperman & Company, LLP



In connection with our reviews of the Company's unaudited quarterly financial information, we will communicate to the audit committee and management any matters that come to our attention that we believe may require material modifications to the financial information to make it conform with U.S. GAAP. Further, we will communicate any significant deficiencies or material weaknesses that come to our attention.

**Management's Responsibilities**

Management is responsible for designing, implementing and maintaining internal controls, relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error, including monitoring ongoing activities; for the selection and application of accounting principles; and for the preparation and fair presentation of the financial statements in conformity with U.S. GAAP. Management is also responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Management is also responsible for providing us with (1) access to all information of which you are aware that is relevant to the preparation and fair presentation of the financial statements, (2) additional information that we may request for the purpose of the audit, and (3) unrestricted access to persons within the Company from whom we determine it necessary to obtain audit evidence. Additionally, management agrees to provide any additions or changes to the Company's affiliates as well as monitor audit independence throughout the engagement period, as further described below.

Management's responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

Management is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the Company involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Management's responsibilities include informing us of their knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, former employees, regulators, or others. In addition, management is responsible for identifying and ensuring that the Company complies with applicable laws and regulations.

Management is also responsible for establishing and maintaining effective internal control over financial reporting, including monitoring activities; notifying us of all deficiencies in the design or operation of internal control over financial reporting of which it has knowledge; and describing to us any fraud resulting in a material misstatement of the financial statements and any other fraud involving senior management or employees who have a significant role in the Company's internal control.

Management is responsible for the Company's interim financial information and for establishing and maintaining effective internal control over financial reporting. It is also responsible for identifying and ensuring that the Company complies with the laws and regulations applicable to its activities; making all financial records and related information available to us; adjusting the interim financial information to correct material misstatements; affirming that the effects of any uncorrected misstatements pertaining to the periods under review are immaterial, both individually and in the aggregate, to the interim financial information taken as a

CITRINCOOPERMAN®

Citrin Cooperman & Company, LLP

Mr. Cem Habib, Audit Committee Chair
Genesis Growth Tech Acquisition Corp.
March 10, 2023
Page 6

whole; and making certain quarterly certifications with respect to the Company's internal control over financial reporting.

At the conclusion of our reviews and our audit, you agree to provide us with a letter that confirms certain representations made by management during our reviews and audit about the Company's financial statements, internal control over financial reporting, and related matters.

**Engagement Administration, Fees, and Other**

We understand that the Company's employees will prepare all cash, accounts receivable, and other confirmations we request, prepare applicable schedules and analyses of accounts, respond to all inquires in a timely manner, and will locate any documents selected by us for testing. The timely and accurate completion of these client assistance requests is an essential condition to our completion of the engagement and issuance or our report.

During the course of serving the Company's account, we will use third-party service providers and/or our wholly-owned and controlled offshore affiliate ("Service Providers"). We will also provide services to the Company using certain third-party hardware, software, software services, and managed services (collectively, "Third-Party Products"). Third-party service providers include individuals who are not employed by our firm. Employees of our controlled offshore affiliate are bound by the same confidentiality agreements as those employees located in the United States of America. We may share confidential information about the Company with these Service Providers and through use of Third-Party Products to perform our engagement. We remain committed to maintaining the confidentiality and security of the Company's information. A full summary of our privacy policies can be located on our website at citrincooperman.com/Privacy-Policy. Accordingly, we maintain internal policies, procedures, and safeguards to protect the confidentiality of the Company's information. In addition, we will secure confidentiality agreements with all Service Providers and vendors of Third-Party Products to maintain the confidentiality of the Company's information and we will take reasonable precautions to determine that they have appropriate procedures in place to prevent the unauthorized release of the Company's confidential information to others. Furthermore, we will remain responsible for our use of any such Service Providers and Third-Party Products. You hereby consent to us sharing the Company's information, including confidential information, with our Service Providers on the same basis as we would be permitted to share information with one of our employees; provided that such recipients are bound by written obligations of confidentiality that are as protective of the Company's information as the confidentiality terms set forth above. Additionally, you hereby consent to the disclosure of the Company's information, to the licensors of such Third-Party Products for the purpose of conducting our engagement.

Management will receive instructions from us inviting you to connect to a secured portal to upload the Company's financial information. This process streamlines our requests for information from you and provides us with the information we need in the format we require. Management will receive this e-mail closer to the commencement of the engagement from a member of your engagement team.

During the course of our engagement, Citrin Cooperman & Company, LLP ("Citrin Cooperman") or the Company may need to electronically transmit confidential information to each other and to other entities engaged by either party. E-mail is a fast and convenient way to communicate. However, e-mail is not a secure

means of communication and thus, confidentiality could be compromised. The Company agrees to the use of e-mail and other electronic methods to transmit and receive information between Citrin Cooperman and the Company and between Citrin Cooperman and third-party service providers or other entities engaged by Citrin Cooperman or the Company.

It is imperative that our personnel have reliable internet connection in order to work effectively and efficiently at all times. Management agrees to supply our personnel with reliable internet access while working on-site at the Company's location.

The audit documentation for this engagement is the property of our firm and constitutes confidential information. However, we may be requested to make certain audit documentation available to the Securities and Exchange Commission ("SEC"), or other regulators pursuant to the authority given to them by law or regulation. If requested, access to such audit documentation will be provided under the supervision of firm personnel. Further, upon request, we may provide copies of selected audit documentation to the regulator. The regulator may intend, or decide, to distribute the copies or information contained therein to others, including other government agencies. We agree to communicate with you on a timely basis any requests by the regulators for access to audit documentation as part of its inspection process and when it desires direct contact with members of the audit committee.

The Company may wish to include or incorporate by reference our audit report on these financial statements in other documents, such as a registration statement proposed to be filed under the Securities Act of 1933 or in some other securities offering. If so, you agree not to include our audit report or make reference to our firm without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

The audit documentation for this engagement is the property of our firm and constitutes confidential information. However, we may be requested to make certain audit documentation available to the SEC, or other regulators pursuant to the authority given to them by law or regulation. If requested, access to such audit documentation will be provided under the supervision of firm personnel. Further, upon request, we may provide copies of selected audit documentation to the regulator. The regulator may intend, or decide, to distribute the copies or information contained therein to others, including other government agencies. We agree to communicate with you on a timely basis any requests by the regulators for access to audit documentation as part of its inspection process and when it desires direct contact with members of the audit committee.

Except with respect to a dispute or litigation between Citrin Cooperman & Company, LLP and Genesis Growth Tech Acquisition Corp., our attorney fees, costs and time spent in legal and regulatory matters or proceedings arising from our engagement, such as subpoenas, testimony, or consultation involving private litigation, arbitration, industry, or government regulatory inquiries, whether made at Genesis Growth Tech Acquisition Corp.'s request or by subpoena, will be billed to the Company separately.

Christopher Brown is the engagement partner and is responsible for supervising the engagement and signing the report or authorizing another individual to sign it. We expect to begin our audit on approximately February 13, 2023.

CITRINCOOPERMAN®

Citrin Cooperman & Company, LLP



Citrin Cooperman & Company, LLP has a contractual arrangement with Citrin Cooperman Advisors LLC, whereby Citrin Cooperman Advisors LLC provides Citrin Cooperman & Company, LLP with professional and support personnel and performs all services in connection with our engagements for which licensure as a CPA firm is not required. In order, to avoid duplication of efforts arising out of this arrangement, we request that you consent to our sharing with Citrin Cooperman Advisors LLC the information that we may obtain from the Company in the course of our engagement. Unless you indicate otherwise, your acceptance of the terms of this engagement shall be understood by us as your consent to make disclosures to Citrin Cooperman Advisors LLC and its employees of confidential information that we may obtain in the course of our engagement. Citrin Cooperman & Company, LLP and Citrin Cooperman Advisors LLC practice as an alternative practice structure in accordance with the AICPA Code of Professional Conduct and applicable law, regulations and professional standards. Citrin Cooperman & Company, LLP provides attest services to its clients. Citrin Cooperman Advisors LLC is not a licensed CPA firm and does not provide audit or attest services. Citrin Cooperman & Company, LLP has a contractual arrangement with Citrin Cooperman Advisors LLC, whereby Citrin Cooperman Advisors LLC provides Citrin Cooperman & Company, LLP with professional and support personnel to perform professional services on behalf of Citrin Cooperman & Company, LLP.

Compliance with auditor independence rules is a shared responsibility between the Company and its independent auditors. Citrin Cooperman's independence and monitoring procedures are designed to address risks related to maintaining the independence of the firm and its professionals. New Mountain Capital ("NMC") is an affiliate of Citrin Cooperman Advisors LLC. The engagement team's procedures included the evaluation of certain portfolio companies at www.newmountaincapital.com/our-strategies/private-equity/portfolio/ controlled by NMC and informing the engagement partner if any portfolio companies provide to the Company any prohibited non-audit services as outlined in Rule 2-01(c)(4) of Regulation S-X. The Company should have protocols to (1) monitor permissible services for which you have engaged Citrin Cooperman or one of the controlled portfolio companies, (2) notify Citrin Cooperman of any concerns or anticipated concerns so those non-audit services are (3) proactively evaluated by both the Company and Citrin Cooperman.

To ensure that Citrin Cooperman's independence is not impaired, you agree to inform the engagement partner before entering into any substantive employment discussions with any of our personnel. When we lose a valued member of our engagement team, we not only incur significant expenses in hiring and training replacement personnel, but employment by Genesis Growth Tech Acquisition Corp. raises serious independence threats, which could cause us to terminate our engagement. We are not deemed independent if an engagement team member joins the Company in a financial reporting oversight role during the engagement period and through Genesis Growth Tech Acquisition Corp.'s subsequent year's annual regulatory filing ("one-year cooling off period").

During the term of this engagement and through the one-year cooling off period, the Company agrees not to solicit, directly or indirectly, or hire any of our personnel participating in the engagement without our express written consent unless it is pursuant to a general solicitation of employment not aimed at Citrin Cooperman's personnel.

Citrin Cooperman is not a host for any client information. The Company is expected to retain all financial and non-financial information including anything the Company's employees upload to Citrin Cooperman's portal.

Management is responsible for downloading and retaining anything we upload to the portal in a timely manner. Portals are only meant as a method of transferring data, are not intended for the storage of client information, and may be deleted at any time. Accordingly management will not expect us to maintain copies of such records in our possession.

We estimate that our fees for these services will be $59,500. You will also be billed for actual other out-of-pocket costs such as report production, direct technology fees, shipping, travel, meals and fees for services from other professionals, as well as a charge of 5% of fees for all other expenses, including indirect administrative expenses such as technology, research and library databases, communications and clerical assistance. Interim billings will be submitted as work progresses and as expenses are incurred. Billings are due upon presentation.

We will notify you immediately of any circumstances we encounter that could significantly affect this initial fee estimate, including, but not limited to the following:

- Scheduling changes or other inefficiencies resulting from delays caused by the inability of management to provide previously agreed-upon schedules and documentation in accordance with the agreed-upon engagement timeline.
- Adjustments, whether client-prepared or resulting from the engagement, that are large in volume.
- Significant or unusual transactions that were not previously disclosed by the Company prior to the finalization of the engagement letter.

In accordance with our firm policies, work may be suspended if the Company's account becomes overdue and will not be resumed until the Company's account is paid in full. You acknowledge and agree that we are not required to continue work in the event of the Company's failure to pay any statement or invoice from us in accordance with our customary invoice terms. Should work be suspended, Citrin Cooperman shall not be liable to the Company for any damages that occur as a result of our ceasing to render services. In the event that a situation arises that precludes us from completing the engagement, the Company agrees to pay us for the time we incurred on this engagement at our standard hourly rates. The Company agrees to reimburse Citrin Cooperman for attorneys' fees and costs incurred in connection with the collection of past due fees.

Any dispute arising out of or relating to this engagement, or breach thereof, shall first be submitted for good faith mediation administered by the American Arbitration Association ("AAA") under Accounting and Related Services Arbitration Rules and Mediation Procedures (the "Rules"). The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties. Mediation shall take place at a place to be designated by the parties in New York, New York. No litigation, arbitration or other proceeding shall be commenced prior to sixty (60) days after the parties' first appearance before the mediator.

CITRINCOOPERMAN®

Citrin Cooperman & Company, LLP



If the matter is not resolved by mediation within sixty (60) days of its submission to the mediator, then the parties shall submit the dispute for arbitration administered by the AAA under the Rules.

The arbitration will be conducted before a single arbitrator selected from the AAA's Panel of Accounting Professionals and Attorneys and shall take place at a place to be designated by the parties. The arbitrator shall be a fit and impartial person and shall have at least ten (10) years' experience in commercial litigation, accounting or a similar field connected to the subject matter of the dispute. The arbitrator, with the aforementioned requisite qualifications, shall be selected pursuant to the Rules.

The arbitrator shall issue his or her final award in a written and reasoned decision to be provided to each party. In his or her decision, the arbitrator will declare one party the prevailing party.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitrator may disclose the existence, content or result of the arbitration only as expressly provided by the Rules.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.

This agreement, its enforcement and any dispute relating in any way to this engagement will be governed by the laws of the State of New York, without giving effect to any provisions relating to conflict of laws that would require the laws of another jurisdiction to apply.

This agreement represents the entire understanding between the Company and Citrin Cooperman with respect to this engagement. Any amendments to this agreement must be in writing and signed by an authorized representative of both parties.

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

Very truly yours,

*Citrin Cooperman & Company, LLP*

CITRIN COOPERMAN & COMPANY, LLP

CLIENT AGREEMENT AND ACCEPTANCE
Agreed and accepted by:

Management signature: *[signature]*

Title: Chairman & CEO

Audit Committee Chair signature: ______________________

Title: ______________________

UCS-840
(rev. 12/16/2024)

# REQUEST FOR JUDICIAL INTERVENTION

SUPREME COURT, COUNTY OF NEW YORK

Index No: 651945/2026 Date Index Issued: 04/02/2026

**For Court Use Only:**
IAS Entry Date
Judge Assigned
RJI Filed Date

**CAPTION** Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

NEUROMIND AI CORP. et al

Plaintiff(s)/Petitioner(s)

-against-

Citrin Cooperman & Company, LLP

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING** Check only one box and specify where indicated.

**COMMERCIAL**

- ○ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ○ Contract
- ○ Insurance (where insurance company is a party, except arbitration)
- ○ UCC (includes sales and negotiable instruments)
- ● Other Commercial (*specify*): Professional malpractice

***NOTE:*** *For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the* ***COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)****.*

**TORTS**

- ○ Asbestos
- ○ Environmental (*specify*): ____
- ○ Medical, Dental or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability (*specify*): ____
- ○ Other Negligence (*specify*): ____
- ○ Other Professional Malpractice (specify): ____
- ○ Other Tort (specify): ____

**SPECIAL PROCEEDINGS**

- ○ Child-Parent Security Act (*specify*): ○ Assisted Reproduction ○ Surrogacy Agreement
- ○ CPLR Article 75 – Arbitration [see ***NOTE*** in **COMMERCIAL** section]
- ○ CPLR Article 78 – Proceeding against a Body or Officer
- ○ Election Law
- ○ Extreme Risk Protection Order
- ○ MHL Article 9.60 – Kendra's Law
- ○ MHL Article 10 – Sex Offender Confinement (*specify*): ○ Initial ○ Review
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene (*specify*): ____
- ○ Other Special Proceeding (*specify*): ____

**MATRIMONIAL**

- ○ Contested

***NOTE:*** *If there are children under the age of 18, complete and attach the* ***MATRIMONIAL RJI ADDENDUM (UCS-840M)****.*
*For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (****UD-13****).*

**REAL PROPERTY** Specify how many properties the application includes: ____

- ○ Condemnation
- ○ Mortgage Foreclosure (*specify*): ○ Residential ○ Commercial
  Property Address: ____

***NOTE:*** *For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the* ***FORECLOSURE RJI ADDENDUM (UCS-840F)****.*

- ○ Partition

***NOTE:*** *Complete and attach the* ***PARTITION RJI ADDENDUM (UCS-840P)****.*

- ○ Tax Certiorari (*specify*): Section: ____ Block: ____ Lot: ____
- ○ Tax Foreclosure
- ○ Other Real Property (*specify*): ____

**OTHER MATTERS**

- ○ Certificate of Incorporation/Dissolution [see ***NOTE*** in **COMMERCIAL** section]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change/Sex Designation Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other (*specify*): ____

**STATUS OF ACTION OR PROCEEDING** Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ● | ○ | If yes, date filed: 03/31/2026 |
| Has a summons and complaint or summons with notice been served? | ● | ○ | If yes, date served: 07/27/2026 |
| Is this action/proceeding being filed post-judgment? | ○ | ● | If yes, judgment date: ____ |

**NATURE OF JUDICIAL INTERVENTION** Check one box only and enter additional information where indicated.

- ○ Infant's Compromise
- ○ Extreme Risk Protection Order Application
- ○ Note of Issue/Certificate of Readiness
- ○ Notice of Medical, Dental or Podiatric Malpractice — Date Issue Joined: ____
- ○ Notice of Motion — Relief Requested: ____ Return Date: ____
- ○ Notice of Petition — Relief Requested: ____ Return Date: ____
- ○ Order to Show Cause — Relief Requested: ____ Return Date: ____
- ○ Other Ex Parte Application — Relief Requested: ____
- ○ Partition Settlement Conference
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Waiver of Court Costs, Fees, and Expenses
- ○ Writ of Habeas Corpus
- ● Other (specify): Request for Commercial Division assignment

**RELATED CASES** List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PARTIES** For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| **Un-Rep** | **Parties** List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | **Attorneys and Unrepresented Litigants** For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | **Issue Joined** For each defendant, indicate if issue has been joined. | **Insurance Carriers** For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: Neuromind AI Corp. f/k/a Genesis Growth Tech Acquisition<br>Role(s): Plaintiff | Denver G. Edwards (Bradford Edwards LLP); 575 Fifth Ave. 14th Floor NY, NY 10017<br>646-455-9044; dedwards@bradfordedwards.com | ○ YES ◉ NO | |
| ☐ | Name: Genesis Growth Tech, LLC<br>Role(s): Plaintiff | Denver G. Edwards (Bradford Edwards LLP); 575 Fifth Ave. 14th Floor NY, NY 10017<br>646-455-9044; dedwards@bradfordedwards.com | ○ YES ◉ NO | |
| ☐ | Name: Citrin Cooperman & Company, LLP<br>Role(s): Defendant | Christina Prusak Chianese (Sidley Austin LLP); 787 Seventh Ave. NY, NY 10019<br>212-839-6062; cchianese@sidley.com | ○ YES ◉ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: 08/13/2026

S/ Christina Prusak Chianese
Signature

4907838
Attorney Registration Number

Christina Prusak Chianese
Print Name

New York State Unified Court System [nycourts.gov](nycourts.gov)

# Request for Judicial Intervention Commercial Division Addendum

UCS-840C (12/2023)
Page **1** of **2**
nycourthelp.gov

**Supreme Court**
**County of** NEW YORK

**Plaintiff/Petitioner** (persons/entities that started the case)**:**
NEUROMIND AI CORP. et al

**Index #:**
651945/2026

**Defendant/Respondent** (persons/entities the case is against)**:**
Citrin Cooperman & Company, LLP

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

- [x] Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g., unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g., sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)
- [ ] Transactions governed by the Uniform Commercial Code, excluding those concerning individual cooperative or condominium units
- [ ] Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only
- [ ] Shareholder derivative actions (without consideration of the monetary threshold)
- [ ] Commercial class actions (without consideration of the monetary threshold)
- [ ] Business transactions involving or arising out of dealings with commercial banks and other financial institutions
- [ ] Internal affairs of business organizations
- [ ] Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters
- [ ] Environmental insurance coverage
- [ ] Commercial insurance coverage (e.g., directors and officers, errors and omissions, and business interruption coverage)
- [ ] Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures (without consideration of the monetary threshold)
- [ ] Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues (where the applicable agreement provides for the arbitration to be heard outside the United States, the monetary threshold set forth in 22 NYCRR 202.70(a) shall not apply)

Plaintiff/Petitioner's claim for compensatory damages, excluding punitive damages, interest, costs, and counsel fees claimed: $ **11,405,000.00**

Plaintiff/Petitioner's claim for equitable or declaratory relief [brief description]:

Plaintiff brings claims for fraud, gross negligence, and negligent misrepresentation related to audit work performed by Defendant

Defendant/Respondent's counterclaims, including claims for monetary relief [brief description]:

Defendant has not yet responded to the complaint, and expressly reserves all rights, defenses, and objections, including its right to compel arbitration of claims asserted against it and to stay this action pursuant to CPLR Article 75 or otherwise.

I request that this case is assigned to the Commercial Division. I certify that the case meets the Commercial Division's jurisdictional requirements as set forth in 22 NYCRR 202.70(a), (b) and (c).

Dated: **08/13/2026**

S/ Christina Prusak Chianese
Signature

**Christina Prusak Chianese**
Print Name

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| GENESIS GROWTH TECH, LLC,<br><br>Plaintiff,<br><br>-against-<br><br>CITRIN COOPERMAN & COMPANY, LLP,<br><br>Defendant. | Index No.: 651945/2026<br><br>**STIPULATION EXTENDING TIME FOR DEFENDANT TO ANSWER, MOVE OR OTHERWISE RESPOND TO COMPLAINT** |

WHEREAS, on March 31, 2026, Plaintiff Genesis Growth Tech, LLC filed a Summons with Notice against Defendant Citrin Cooperman & Company LLC;

WHEREAS, on July 27, 2026 Plaintiff served the Complaint on Defendant;

WHEREAS, the parties to this stipulation have conferred and, absent any future adjustments by the Court, reached agreement regarding the schedule for responding to the Complaint;

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned attorneys for the respective parties, that the time for Defendant to answer, move or otherwise respond to the Complaint is hereby extended up to and including September 9, 2026. The parties agree that further request for an extension of time to respond to the Complaint requires application to the Court, and Plaintiff reserves the right to oppose.

IT IS FURTHER STIPULATED AND AGREED that this stipulation may be executed in counterparts and by electronic signature, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

Dated: August 14, 2026

**BRADFORD EDWARDS LLP**

By: Denver Edwards

Denver G. Edwards
575 Fifth Avenue, 14th Floor
New York, New York 10017
Tel: (646) 455-9044
dedwards@bradfordedwards.com

*Attorneys for Plaintiff*
*Genesis Growth Tech, LLC*

**SIDLEY AUSTIN LLP**

By: S/ Christina Prusak Chianese

Christina Prusak Chianese
787 Seventh Avenue
New York, New York 10019
Tel: (212) 839-5300
cchianese@sidley.com

*Attorneys for Defendant*
*Citrin Cooperman & Company, LLP*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| NEUROMIND AI CORP. f/k/a GENESIS GROWTH TECH ACQUISITION, LLC and GENESIS GROWTH TECH, LLC,<br><br>Plaintiffs,<br><br>-against-<br><br>CITRIN COOPERMAN & COMPANY, LLP,<br><br>Defendant. | Index No.: 651945/2026<br><br>**STIPULATION AMENDING CAPTION** |

**IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned attorneys for the respective parties, that NeuroMind AI Corp. f/k/a Genesis Growth Tech Acquisition Corporation shall be removed as a Plaintiff from this action, without costs to any party, and that Genesis Growth Tech, LLC shall remain the sole Plaintiff. The caption of this action is hereby amended and shall hereafter read as follows:

| | |
|---|---|
| GENESIS GROWTH TECH, LLC,<br><br>Plaintiff,<br><br>-against-<br><br>CITRIN COOPERMAN & COMPANY, LLC<br><br>Defendant. | Index No.: 651945/2026 |

**IT IS FURTHER STIPULATED AND AGREED** that the Clerk of the Court is directed to amend the caption and the records of the Court to remove NeuroMind AI Corp. f/k/a Genesis

Growth Tech Acquisition Corporation as a Plaintiff and to reflect Genesis Growth Tech, LLC as the sole Plaintiff.

**IT IS FURTHER STIPULATED AND AGREED** that all papers previously filed and all proceedings previously had in this action shall be deemed amended to reflect the amended caption without the necessity of refiling or re-serving the same.

**IT IS FURTHER STIPULATED AND AGREED** that Defendant Citrin Cooperman & Company, LLP's ("Citrin") execution of this Stipulation is solely for purposes of amending the caption and shall not waive or prejudice any rights, defenses, or objections.

**IT IS FURTHER STIPULATED AND AGREED** that this stipulation may be executed in counterparts and by electronic signature, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

Dated: New York, New York
August 14, 2026

**BRADFORD EDWARDS LLP**

By: Denver Edwards
Denver G. Edwards
575 Fifth Avenue, 14th Floor
New York, New York 10017
Tel: (646) 455-9044
dedwards@bradfordedwards.com

*Attorneys for Plaintiff*
*Genesis Growth Tech, LLC*

**SIDLEY AUSTIN LLP**

By: S/ Christina Prusak Chianese
Christina Prusak Chianese
787 Seventh Avenue
New York, New York 10019
Tel: (212) 839-5300
cchianese@sidley.com

*Attorneys for Defendant*
*Citrin Cooperman & Company, LLP*

**SO ORDERED.**

______________________________

______________________________
Date